UNITED STATES, Appellee,

v.

Michael A. WILLIAMS, Private First
Class, U.S. Army, Appellant.

No. 42,639.
CM 440077.

U.S. Court of Military Appeals.

Feb. 21, 1984.

For Appellant: *Captain William T. Wilson* (argued); *Colonel William G. Eckhardt, Lieutenant Colonel R. Rex Brookshire, II, Major Stephen R. Dooley* (on brief).

For Appellee: *Captain David A. Brown* (argued); *Colonel James Kucera, Lieutenant Colonel John T. Edwards, Major Thomas M. Curtis, Captain Samuel J. Rob* (on brief).

*Opinion of the Court*

EVERETT, Chief Judge:

On September 17, 1980, appellant was tried at Fort Hood, Texas, by a general court-martial composed of officers. The charge, preferred under Article 134 of the Uniform Code of Military Justice, 10 U.S.C. § 934, contained a single specification, which alleged:

> In that Private First Class Michael A. Williams [appellant], US Army, Headquarters and Headquarters Troop, 4th Squadron 9th Cavalry, 6th Cavalry Brigade (Air Combat), did, *at Fort Hood, Texas, a military installation,* on or about 0200 hours, 16 July 1980, wrongfully and unlawfully kidnap the person of Private El Warren S. Nipper, *in violation of 18 United States Code, § 1201(a)(2).*

(Emphasis supplied.) Appellant was found guilty as charged and was sentenced to a dishonorable discharge, confinement at hard labor for 5 years, total forfeitures, and reduction to the grade of E–1. The findings and sentence were approved by the conven-

ing authority and, in turn, affirmed by the Court of Military Review.

This Court granted review to consider: WHETHER THE EVIDENCE WAS SUFFICIENT TO ESTABLISH· THAT THE KIDNAPPING CHARGED UNDER 18 U.S.C. § 1201(a)(2) OCCURRED WITHIN THE SPECIAL MARITIME AND TERRITORIAL JURISDICTION OF THE UNITED STATES (18 U.S.C. § 7).

After initial briefing and oral argument in this Court, we ordered a hearing pursuant to *United States v. DuBay,* 17 U.S.C. M.A. 147, 37 C.M.R. 411 (1967). 14 M.J. 428 (C.M.A.1983). That hearing was conducted and the record thereof has been authenticated and returned to this Court. Further briefs and oral argument have been considered, and now the case is ready for final disposition.

I

In an Article 39(a)[1] session prior to trial, defense counsel explained that "the big issue in this case is whether or not the offense took place on or off post"; and he contended "that it is an essential ·element that the abduction took place on post." Trial counsel responded that

the Government realizes that there is going to be a jurisdictional question here, and we have no problem whatsoever with permitting the panel to make the decision as to whether or not the incident occurred on or off post. In fact, that is what the Government expected [to be] one of the issues that the panel would have to decide in this case.

The military judge then remarked:

All right, normally, jurisdiction is not a question—a legal question for the members of the court, however, where it's a factual question as to the location of the particular area, then it would go to the members of the court—

When trial began, Private Warren Nipper, the alleged victim, testified that about 1:00 a.m. on July 16, 1980, he left his barracks to get some cigarettes. He went over to a bowling alley about 1500 meters away, but it was closed. As he walked back to his barracks, two black men in a Lincoln Continental told him to stop; since one of them had a pistol, Nipper complied with the request and then got into the back seat of the car. They drove off post to the Tip Top Grocery, where Nipper was allowed to leave the car. Meanwhile, the two men had taken his wallet and his watch. According to the witness, appellant was the driver of the car, and about a week later, he identified a picture of Williams at the Killeen, Texas, Police Department.

Sergeant John Warford, a Killeen police officer, corroborated the testimony of Nipper that about a week after the kidnapping he had picked out appellant's photograph from a group of others. Private Thomas Rondeau testified that, after he had gone to downtown Killeen on the night of July 15, two black men had robbed him of his Lincoln automobile, money, and other property. In the course of this incident, one of the two men had "said that he wanted to go on or near ... [Fort Hood] to rob a 'white soldier.'" Rondeau could only identify William Lane as one of the two men who "took off with" his car, and he testified that Lane had been the driver at the time. On cross-examination, Rondeau added that in a conversation between the two men about committing a robbery, one of them had suggested that they go on post, but the other remonstrated "that they shouldn't go on post because, you know, they had a good chance of getting caught by the military police." It was not Lane, but the other man, "who made ... [the] statement about going on post and robbing a 'white soldier.'"

Testifying in his own defense, appellant acknowledged that he had seen Nipper in Killeen early on the morning of July 16, when Nipper had asked for a ride. "Lane was driving the car and I was a passenger." Williams asked Nipper if he had any money and he replied in the negative. Then Nipper pulled out his wallet, which was empty

1. Uniform Code of Military Justice, 10 U.S.C. § 839(a).

of money; and he also had no watch or any jewelry. Appellant and Lane—neither of whom had a pistol—finally dropped Nipper off and just drove away. Williams used various diagrams to describe where the events had taken place off post.

The defense rested, after which, during an Article 39(a) session, the judge took judicial notice of 18 U.S.C. § 1201 at the Government's request. Then trial counsel argued to the court members that appellant and Lane had kidnapped Nipper at Fort Hood, driven him "to a small grocery store parking lot, directly on the Killeen side of the Fort Hood/Killeen border," and then "proceeded to rob him." Contrariwise, defense counsel contended that the only contact between Nipper and appellant had occurred off post.

In instructing the members of the court, the judge explained that they must be satisfied beyond a reasonable doubt:

> First, that at *Fort Hood, Texas,* on or about the 16th of July of 1980 about 0200 hours, that the accused unlawfully kidnapped a Private E–1 Warren S. Nipper; Secondly, that this kidnapping was against the will of Private Nipper; Third, that the kidnapping was accomplished by pointing a pistol at him and requiring him to enter a vehicle which transported him some distance away; Fourth, that this kidnapping was for the purpose of robbing Private Nipper, or for any other purpose as far as that goes; and Finally, that under the circumstances, the conduct of the accused would be to the prejudice of good order and discipline in the Armed Forces or of such a nature as to tend to bring discredit upon the Armed Forces.

(Emphasis supplied). The judge also advised:

> The term "kidnap" as used in this Specification means to forcibly and unlawfully carry away another person and to detain, keep or confine that person against his will. There is no length of time involved. Any detention or period of detention, no matter how brief, would suffice for the

purposes of this particular offense. The phrase "against the will of the victim" means that the kidnapping must have been involuntary, or coerced. Now, this coercion must be accompanied by the willful intent to confine, detain or keep the victim. Coercion may be accomplished either by physical or mental means.

At no point in his instructions did the judge expressly inform the court members that, if the offense occurred off post, they should acquit; and he did not refer to 18 U.S.C. § 1201 and its jurisdictional requirements. However, counsel did not call attention to this omission, and the defense did not object to the instruction given or request further instructions. The members of the court-martial swiftly returned findings of guilty.

Our order for a *DuBay* hearing directed the

> military judge ... to determine ...:
>
> 1. The boundaries of Fort Hood, Texas;
>
> 2. The types of Federal jurisdiction over ... Fort Hood;
>
> 3. The history of ... acquisition of jurisdiction by the United States over Fort Hood, Texas, including:
>
> > a. the cession of jurisdiction ... by the State of Texas ... and
> >
> > b. the acceptance of jurisdiction by the United States (40 U.S.C. § 255).
>
> 4. The location of places described in the record as pertaining to the events of the offense.

14 M.J. at 429.

After a hearing at Fort Hood on May 10, 1983, the judge returned findings of fact and conclusions of law as follows:

> 1. The land comprising the Fort Hood Military Reservation was acquired in three segments, as follows:
>
> a. Approximately 157,588.023 acres of land was acquired by purchase and condemnation in 1942 and 1943. This land is commonly referred to as the "original acquisition" ...

b. Approximately 1,666 acres of land was added to the southwest corner of the ... Reservation in 1948....

c. The final acquisition of land occurred in 1954.[2] ...

2. The boundary of the Fort Hood Military Reservation as it existed on 16 July 1980, is depicted on Prosecution Exhibit 18 by an unbroken blue line. All land within this unbroken blue line is now and was then part of the Fort Hood Military Reservation except:

a. The six (6) tracts excepted from the deed of cession, ... and indicated on ... [the exhibit].

b. The right of way for U.S. Highway 190 ...

c. The right of way for Texas State Highway 36.

d. Two tracts of land deeded to Central Texas College, ... indicated on exhibit 18 ...

3. Action was initiated in 1947 to obtain exclusive Federal jurisdiction over the Fort Hood Military Reservation.... On September 6, 1950, the governor of the State of Texas ... ced[ed] to the United States of America exclusive jurisdiction over the land referred to ... as the "original acquisition." By letter dated 30 October 1950, ... the Secretary of the Army accepted jurisdiction on behalf of the United States.

4. A request that action be initiated to obtain exclusive jurisdiction over the remainder of the Fort Hood Military Reservation was disapproved by the ... Army, on August 18, 1960.

5. [E]xclusive Federal jurisdiction exists over that part of the Fort Hood Military Reservation referred to ... as the "original acquisition." No type of Federal jurisdiction exists over the remainder of the reservation.

\* \* \* \* \* \*

7. All places pertaining to the events of the offense which are described in the record of trial as located on the Fort Hood Military Reservation are depicted on Prosecution Exhibits 20 and 21 and are places where the United States exercises exclusive Federal jurisdiction.

Both trial counsel and defense counsel concurred in these findings of fact and conclusions of law; and neither requested any additional findings of fact or conclusions of law.

## II

In two respects, the place where the kidnapping occurred was relevant to the court-martial's jurisdiction over the offense. First, the location affected the service connection of the crime under *O'Callahan v. Parker,* 395 U.S. 258, 89 S.Ct. 1683, 23 L.Ed.2d 291 (1969). If—as the specification alleged—the offense occurred at Fort Hood, it clearly was service connected under *Relford v. Commandant,* 401 U.S. 355, 91 S.Ct. 649, 28 L.Ed.2d 102 (1971). If it occurred off post, service connection—and military jurisdiction—would be less clear.

The location of the offense also was material because appellant was being prosecuted under 18 U.S.C. § 1201(a), as incorporated by the third clause of Article 134. *See United States v. Scholten,* 17 M.J. 171 (C.M.A.1984). This statute establishes "four jurisdictional bases" for punishment of kidnapping by Federal courts. *United States v. Lewis,* 662 F.2d 1087, 1090 (4th Cir.1981), *cert. denied,* 455 U.S. 955, 102 S.Ct. 1464, 71 L.Ed.2d 672 (1982). One of these "jurisdictional bases" is the "special maritime and territorial jurisdiction of the United States," as defined by 18 U.S.C. § 7. *Id.* at 1089.

In this case, "special maritime and territorial jurisdiction" depends on the existence of "exclusive or concurrent [Federal] jurisdiction" over the place where the offense took place. 18 U.S.C. § 7(3). Although some may assume that a military installation automatically comes within Federal jurisdiction, that assumption is in-

---

**2.** According to prosecution exhibit 8, referred to in the judge's findings, this final acquisition contained 49,578.72 acres.

correct. Instead, under Art. I, § 8, cl. 17 of the United States Constitution, the existence of exclusive or concurrent Federal jurisdiction requires the consent of the State where the installation is located, and without that consent, the possession by the United States is "simply that of an ordinary proprietor." *Paul v. United States,* 371 U.S. 245, 264, 83 S.Ct. 426, 437, 9 L.Ed.2d 292, 304 (1963); *see James v. Dravo Contracting Co.,* 302 U.S. 134, 141–42, 58 S.Ct. 208, 212, 82 L.Ed. 155, 162 (1937); *United States v. Perry,* 12 M.J. 112 (C.M.A.1981).

▪ Often the jurisdictional status of a military post will be affected by the date on which the United States acquired the land and the State policy at that time about ceding jurisdiction to the United States. Moreover, Federal policy about accepting cessions of jurisdiction has not always been the same. Prior to 1940, acceptance of cessions could be "presumed in the absence of evidence to the contrary." *United States v. Cassidy,* 571 F.2d 534, 536 (10th Cir.), *cert. denied,* 436 U.S. 951, 98 S.Ct. 2859, 56 L.Ed.2d 793 (1978); *United States v. Watkins,* 22 F.2d 437 (N.D.Cal.1927). "Since 1940 Congress has required the United States to assent to the transfer of jurisdiction over the property, however it may be acquired." *Paul v. United States, supra* 371 U.S. at 264, 83 S.Ct. at 437 (footnote omitted); *see United States v. Cassidy, supra,* and 40 U.S.C. § 255. Thus, in order to demonstrate that exclusive or concurrent Federal jurisdiction exists as to a military installation or other property owned by the United States, it must be established not only that the State involved ceded jurisdiction but also that the United States accepted the cession. *Adams v. United States,* 319 U.S. 312, 63 S.Ct. 1122, 87 L.Ed. 1421 (1943).

Occasionally, not every part of a military installation has the same jurisdictional status. For example, one part might be subject to exclusive Federal jurisdiction; another, to concurrent Federal and State jurisdiction; and as to a third part, the Federal Government might enjoy only the rights of a proprietor. The findings made by the

military judge at the *DuBay* hearing reveal that while a large part of Fort Hood—the "original acquisition"—was, with a few exceptions, subject to exclusive Federal jurisdiction, the United States never acquired any jurisdiction over almost 50,000 acres of the military reservation. Consequently, Federal jurisdiction under 18 U.S.C. § 1201 over a kidnapping at Fort Hood would depend on where the offense took place on the post.

## III

At the beginning of the trial and during the arguments before findings, trial and defense counsel recognized that it was important to determine whether Nipper was kidnapped off post or on post. However, inexplicably, the judge did not specifically advise the court members about the significance of the location of the offense. Instead, he only instructed in general terms that to convict Williams they must find "that *at Fort Hood, Texas* ... the accused unlawfully kidnapped a Private E–1 Warren S. Nipper." (Emphasis supplied).

Furthermore, apparently neither counsel nor the judge perceived during the entire trial that, even if the kidnapping occurred at Fort Hood, jurisdiction to prosecute under 18 U.S.C. § 1201 depended on establishing that the offense was committed at a place on post as to which Texas had ceded exclusive or concurrent criminal jurisdiction and the United States had accepted the cession. Consequently, the record is devoid of evidence as to the jurisdictional status of Fort Hood, and the judge was never requested to take judicial notice of anything other than the language of 18 U.S.C. § 1201.

When this case originally reached this Court, the Government contended that we could take judicial notice that the kidnapping had occurred within "the special maritime and territorial jurisdiction of the United States." In their view, the finding of guilty by the members signified that they had believed the testimony of Nipper, according to whom the offense had been committed on post. Moreover, although the

judge had not focused the members' attention on the importance of the locus of the crime, he had instructed the court members that the first of the five elements of the offense was that "*at Fort Hood, Texas, . . .* the accused unlawfully kidnapped" Private Nipper. According to the Government, this Court could then judicially notice under Mil. R.Evid. 201 that the Federal Government had exclusive or concurrent jurisdiction over the place at Fort Hood where the kidnapping took place.

Indeed, Federal courts of appeals have sometimes been quite liberal in taking judicial notice as to the jurisdictional status of the location where an offense occurred. For example, in *United States v. Lavender,* 602 F.2d 639 (4th Cir.1979), the Court of Appeals took judicial notice that the place of the crimes on the Blue Ridge Parkway was within Federal jurisdiction. In *United States v. Benson,* 495 F.2d 475 (5th Cir.), *cert. denied,* 419 U.S. 1035, 95 S.Ct. 519, 42 L.Ed.2d 310 (1974), which involved two robberies at Fort Rucker, Alabama, the Court of Appeals ruled that "[i]t was in order for the trial court to judicially notice the status of Fort Rucker as a military enclave under" 18 U.S.C. § 7(3). 495 F.2d at 482. In *United States v. Blunt,* 558 F.2d 1245 (6th Cir. 1977), where the defendant had been convicted of assault with a deadly weapon with intent to do bodily harm at the Federal Correctional Institution, Lexington, Kentucky, in violation of 18 U.S.C. § 113(c), the Court of Appeals observed that "[t]he district court would have been correct in taking judicial notice under Rule 201, Federal Rules of Evidence, of the fact that the Institution was within the territorial jurisdiction of the United States." *Id.* at 1247.

In *United States v. Carter,* 430 F.2d 1278 (10th Cir.1970), where the conviction was for assault with a knife with intent to do bodily harm on lands within the special maritime and territorial jurisdiction of the United States, in violation of 18 U.S.C. § 113(c), the Court of Appeals held that the trial court had not erred "in taking judicial notice of the fact that Lowry Air Force Base is a Governmental institution located on a federal island or enclave within the city where the trial court sits." *Id.* at 1280.

In *United States v. Bowers,* 660 F.2d 527 (5th Cir.1981), the defendant had been convicted, following a jury trial, of cruelty to a child, in violation of the Georgia child abuse statute, as it applied to a federal reservation through the Assimilative Crimes Act, 18 U.S.C. § 13. On appeal, she complained that the trial court had erred "in taking judicial notice that Fort Benning, Georgia, is on land which is property of the United States and is under the jurisdiction of [the] United States," because the court had failed "to inform the jurors that they were not bound to accept the noticed fact." *Id.* at 530. *See also* Fed.R.Evid. 201(g); *United States v. Mead,* 16 M.J. 270 (C.M.A.1983). In response, the court of appeals observed that "Rule 201 'governs only judicial notice of adjudicative facts,' . . . and not legislative facts." *Id.* at 530. Obviously the Court believed that the jurisdictional status of Fort Benning fell within the second category, for it observed:

> The fact that Fort Benning is under federal jurisdiction is a well established fact appropriate for judicial notice. [Citation omitted.] Unlike an adjudicative fact, this fact does not change from case to case but, instead, remains fixed.

Also, the Court in *Bowers* dealt with a defense contention that the evidence did not establish that the charged offense occurred at Fort Benning, so the trial court lacked subject-matter jurisdiction: "Although territorial jurisdiction and venue are essential elements of any offense," they "are not to be treated as essential elements in the sense that they must be established by proof beyond a reasonable doubt. [Citation omitted.] Rather, venue, *i.e.,* the location of the criminal activity, need only be established by a preponderance of the evidence"; and under "this standard of proof, . . . the evidence was sufficient to show that appellant physically abused her child within the confines of Fort Benning." *Id.* at 531.

Although Mil.R.Evid. 201 is derived from the corresponding Federal Rule, they are

not identical. For example, the Military Rule authorizes a "military judge" to "take judicial notice" "at any stage of the proceeding." *See also* Mil.R.Evid. 201A. Since this Court has no "military judges," we are not specifically included within the Rule. On the other hand, Fed.R.Evid. 201 applies to "[a] court," and Fed.R.Evid. 1101(a) includes "the United States courts of appeals" within this term.

■ We are convinced, however, that this Court is entitled to take judicial notice of indisputable facts. In the first place, we do not believe that the use of the term "military judge" in Mil.R.Evid. 201 was intended to exclude this Court. Indeed, we can think of no reason the President would have chosen to do so. Moreover, in view of the other powers granted us by Congress, *cf. United States v. Matthews,* 16 M.J. 354 (C.M.A.1983), we consider that our power under Article 67(a)(1) of the Uniform Code, 10 U.S.C. § 867(a)(1), to "prescribe ... [our] own rules of procedure" would encompass the power to prescribe rules for our taking judicial notice. Indeed, the power to take judicial notice is probably one of our inherent powers as an appellate court.

Nonetheless, after the original argument in the case, we concluded that we should not then take judicial notice as the Government had requested; instead we ordered a *DuBay* hearing. One reason for our refusal to take judicial notice at that time was the possible impairment of appellant's statutory right to have his guilt established before the members of a court-martial. *See United States v. Mead, supra.* The second reason was that we lacked then "the necessary information" to take judicial notice, *see* Mil.R.Evid. 201(d); and it was unclear to us that the jurisdictional status of Fort Hood was "either (1) generally known universally, locally, or in the area pertinent to the event or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Mil.R.Evid. 201(b).

As a result of the *DuBay* hearing, certain gaps in the record have been filled. According to the findings of the military judge, about 157,588.023 acres of the Fort Hood Military Reservation—less a few excepted areas—have been subject to the exclusive jurisdiction of the United States since October 30, 1950; but 49,578.72 other acres have never been subject to any Federal jurisdiction. Moreover, the record now contains a number of maps and other exhibits which show various areas of Fort Hood and portray the jurisdictional status of those areas.

As far as we can determine, the cases allowing judicial notice of "the special maritime and territorial jurisdiction" over certain Federal installations did not involve forts or other facilities of which, as here, only a part is subject to Federal jurisdiction. We suspect that, consequently, none of those cases presented the same complications that exist here in establishing what parts of a Federal installation are subject to Federal jurisdiction.

■ With this complexity in mind, we cannot say that the facts about which parts of Fort Hood are subject to Federal jurisdiction should be judicially noticed by us. Nothing in the record indicates that such facts are "generally known universally, locally, or in the area pertinent to the event." Moreover, from our study of the record of the *DuBay* hearing in this case, we do not perceive how in this Court these facts would be "capable of accurate *and ready* determination by resort to sources whose accuracy cannot reasonably be questioned." *See* Mil.R.Evid. 201(b). (Emphasis supplied).

Perhaps, for a trial judge sitting at Fort Hood, such an "accurate and ready determination" would be feasible "by resort to [reliable] sources whose accuracy cannot reasonably be questioned." Mil.R.Evid. § 201(b). However, even that seems doubtful to us.

If, as in *United States v. Mead, supra,* appellant here had initially waived a trial by members, the findings in the *DuBay* hearing might be an adequate basis for upholding the court-martial's jurisdiction of the offense. As the court of appeals observed in *United States v. Bowers, supra,*

**215**

territorial jurisdiction—although an essential element of the offense—is different in some respects from other elements. In view of that difference, we would be more willing after a bench trial to allow this element to be established in a *DuBay* hearing during the appeal of a conviction than to permit proof in this manner of some other element of the offense which had been overlooked at trial.

■ However, in this case appellant exercised his statutory right to trial by court members, and that right must be protected. Therefore, all factual issues concerning guilt or innocence—including any issue of territorial jurisdiction—must be submitted to the members for determination. Even as to adjudicative facts which the judge judicially notices, the court-martial members have the final word, as they must be instructed under Mil.R.Evid. 201(g). Obviously, the *DuBay* hearing which we ordered did not provide the court members an opportunity to participate in determining if appellant's offense was committed within "the special maritime and territorial jurisdiction of the United States."

■ The Government contends, however, that the jurisdictional status of Fort Hood is purely a question of law which the members have no role in deciding. Certainly as to "questions of law," the ruling of the military judge "is final," Article 51(b), UCMJ, 10 U.S.C. § 851(b); and since by statute the judge's rulings on legal questions are conclusive, they must be obeyed by the members. Therefore, despite any intimation to the contrary in Mil.R.Evid. 201A(a), *see United States v. Mead, supra,* the judge should not instruct court members that they may disregard matters of law of which he has taken judicial notice. Moreover, if the judge has failed to take judicial notice at trial of relevant domestic law, a *DuBay* hearing might remedy that omission without impairing the accused's right to trial by members.

From our consideration of the findings of the judge at the *DuBay* hearing, we are convinced, however, that in this case more than questions of law were involved in establishing which locations at Fort Hood come within "the special maritime and territorial jurisdiction of the United States." Therefore, during the trial before the members, the prosecution should have offered evidence about the extent of Federal jurisdiction over Fort Hood, and the judge should have submitted this issue to the members under proper instructions.[3]

In summary, we conclude that in this case this Court should not take judicial notice of the jurisdictional status of various parts of Fort Hood. Furthermore, the findings of the judge at the *DuBay* hearing as to exclusive Federal jurisdiction over parts of Fort Hood were not an adequate substitute for allowing the court members to determine whether territorial jurisdiction existed over the place of the kidnapping.

We are especially disinclined to use judicial notice or the *DuBay* hearing to salvage for the Government its conviction of appellant under 18 U.S.C. § 1201, because at trial the military judge never specifically advised the court members of the importance of determining where the crime had taken place. Thus, although the members probably accepted Nipper's account that the kidnapping took place on post, they may have found instead that the offense occurred off post—which would be outside "the special maritime and territorial jurisdiction of the United States" required by § 1201.

### IV

■ Although we decline to uphold the court-martial's finding that Williams was guilty of kidnapping under 18 U.S.C. § 1201 and the third clause of Article 134, we believe that the conviction can be sustained under the first two clauses of Article 134. In *United States v. Mayo,* 12 M.J. 286 (C.M. A.1982), the accused had been prosecuted under the third clause of Article 134 for a

3. This procedure was followed in *United States v. Cassidy,* 571 F.2d 534 (10th Cir.), *cert. denied,* 436 U.S. 951, 98 S.Ct. 2859, 56 L.Ed.2d 793 (1978) (Federal Correctional Institute in Colorado).

violation of 18 U.S.C. § 844(e). However, we concluded that the specification failed to contain a necessary allegation that the accused had used one of the means of communication required for conviction under section 844(e). Nonetheless, we held that the specification was sufficient to allege conduct to the prejudice of good order and discipline. Moreover, the findings of guilty were unassailable since the allegations of the specification were supported by evidence and the trial judge instructed the court members that they had to find, beyond a reasonable doubt, that the accused's conduct was prejudicial to good order and discipline.

■ As *United States v. Scholten, supra,* makes clear, the Government may have three alternatives available in prosecuting the offense of kidnapping—one of these being a prosecution predicated on the first two clauses of Article 134. In the case at bar, the language of the specification was broad enough to encompass all the allegations that would be required for a prosecution under the first two clauses of Article 134. *See United States v. Scholten, supra.* For such a prosecution there is no requirement that the specification allege that the conduct involved be prejudicial to good order and discipline or service discrediting. *United States v. Mayo, supra.*

The specification here stated that the kidnapping occurred at Fort Hood—an allegation which in itself would demonstrate service connection. *Relford v. Commandant, supra.* Moreover, the specification alleged the military status of the victim, a factor very material to service connection. *Cf. United States v. Lockwood,* 15 M.J. 1 (C.M.A.1983). All the evidence—including appellant's testimony—demonstrated that all relevant events occurred either at Fort Hood or almost adjacent thereto. Thus, the military judge—who had the task of determining service connection—could readily conclude that the crime was service connected.

■ The evidence offered by the Government was sufficient to establish the elements of kidnapping—as those elements are described in *Scholten*—and to show that appellant's conduct prejudiced good order and discipline in the Army and was service discrediting. The judge's instructions to the members contained the elements required by *Scholten,* including a specific instruction that, as a necessary element of the crime, the Government was required to prove that appellant's conduct prejudiced good order and discipline or was service discrediting. While such an instruction would have been unnecessary for conviction of appellant under 18 U.S.C. § 1201, as incorporated by the third clause of Article 134, it would be essential in a prosecution under the first two clauses of Article 134. Since the instruction was given, the finding of guilty can be affirmed, just as was done in *Mayo.* Thus, the reference in the specification to 18 U.S.C. § 1201 can be treated here as surplusage, just as the reference to 18 U.S.C. § 844(e) was surplusage in *Mayo.*

As we noted in *Scholten,* the elements of the offense of kidnapping when prosecuted under the first two clauses of Article 134 conform to those of the crime prohibited by 18 U.S.C. § 1201—except that the jurisdictional basis is different. In the former instance, the jurisdictional basis is prejudice to good order and discipline in the armed service or service-discrediting conduct. In the latter instance, one of "four jurisdictional bases" must be established—namely, "interstate or foreign commerce, maritime or territorial jurisdiction, special aircraft jurisdiction, and foreign guests of the government." *United States v. Scholten, supra* at 173; *see United States v. Lewis, supra.*

■ Within the meaning of paragraph 127*c* (1), Manual for Courts-Martial, United States, 1969 (Revised edition), the offense of kidnapping proscribed by the first two clauses of Article 134 is "closely related" to the crime of kidnapping prohibited by 18 U.S.C. § 1201(a). Since the President has not established a maximum punishment for kidnapping in the Table of Maximum Punishments, the maximum punishment for

kidnapping under the first two clauses of Article 134 is the same as under § 1201(a). *See United States v. Jackson,* 17 U.S.C.M.A. 580, 38 C.M.R. 378 (1968). Thus, appellant will not be prejudiced in any way as to sentence if we uphold his conviction under the first two clauses of Article 134, rather than under 18 U.S.C. § 1201 as incorporated by the third clause of Article 134.

V

Since appellant suffered no prejudice as to the findings or sentence, the decision of the United States Army Court of Military Review is affirmed.

Judge FLETCHER concurs.

Judge COOK concurs in the result.