## UNITED STATES

### v.

**Airman Gregory L. ROBBINS, FR335–78–4142, United States Air Force.**

### ACM 32613.

U.S. Air Force Court of Criminal Appeals.

Sentence Adjudged 9 Dec. 1996.

Decided 18 June 1998.

Appellate Counsel for Appellant: Colonel Douglas H. Kohrt, Lieutenant Colonel Kim L. Sheffield, and Major Kevin P. Koehler.

Appellate Counsel for United States: Colonel Brenda J. Hollis, Lieutenant Colonel Michael J. Breslin, and Captain Martin J. Hindel.

Before SNYDER, Senior Judge,
SENANDER and MORGAN, Appellate Military Judges.

## OPINION OF THE COURT

SNYDER, Senior Judge:

The primary issue we decide in this case is whether the Ohio fetal homicide statute may be prosecuted as a violation of Article 134, UCMJ, via the federal Assimilative Crimes Act (ACA), 18 U.S.C. § 13. We hold, yes.

Appellant was convicted by a military judge sitting as a general court-martial, pursuant to his pleas, of committing a battery on his pregnant wife, KAR, intentionally inflicting grievous bodily harm on KAR, and committing involuntary manslaughter by unlawfully causing the termination of KAR's pregnancy, wherein the 34-week-old fetus, Jasmine (the name appellant and KAR selected after a June 1996 ultrasound examination revealed her gender) expired, as a result of the battery committed on KAR. Articles 128 and 134, UCMJ, 10 U.S.C. §§ 928 and 934 (1994). The military judge sentenced him to a dishonorable discharge, confinement for 8 years, and reduction to E–1, which the convening authority approved. Further, pursuant to Article 58(b), UCMJ, for six months, the convening authority waived $900.90 per month of the mandatory forfeitures of appellant's pay for the benefit of KAR.

Appellant has submitted four assignments of error, two of which are submitted pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A.1982). Only two of them require detailed discussion.

In view of appellant's provident pleas of guilty, there are no factual disputes. His responses to the military judge's inquiries, *see United States v. Care*, 40 C.M.R. 247, 1969 WL 6059 (C.M.A.1969), and the stipulation of fact describe his crimes in detail. Briefly, the on-base quarters which appellant and KAR occupied at Wright–Patterson Air Force Base, Ohio, are located in an area of exclusive federal jurisdiction. At these quarters, during the evening of 12 September 1996, after wrapping his fist in a T-shirt to reduce the prospect of inflicting visible bruises, appellant assaulted KAR by striking her repeatedly in her face and abdomen with his fist. As a result of his assault on KAR, she suffered a severely battered eye, a broken nose, and a ruptured uterus. KAR fled to adjoining quarters and asked the occupant, Airman First Class T, a security policeman, to call an ambulance, which he did by reporting the incident to the law enforcement desk. At the base medical center emergency room, medical personnel could not detect a fetal heartbeat. Emergency surgery revealed "Baby" Jasmine laying sideways, dead, in KAR's abdominal cavity. As a result of appellant's repeated blows rupturing KAR's uterus, the placenta was torn from the inner uterine wall, which expelled Jasmine into KAR's abdominal cavity.

## I. WAIVER

First, we must address the issue of waiver. Appellate defense counsel attack appellant's conviction of this offense by averring that his guilty plea was improvident as a result of the preemption doctrine, which we discuss, *infra.* Appellate government counsel counters with the traditional response; namely, there is more than an adequate factual basis for the pleas, and there is nothing in the record which is inconsistent with appellant's pleas. Further, appellate government counsel argue, appellant waived appellate review of this issue. We disagree.

Civilian trial defense counsel moved that the military judge certify to the Ohio Supreme Court the question of the statute's constitutionality under the Equal Protection Clause of the Ohio State Constitution, but the military judge denied the motion. Trial defense counsel did not move for dismissal of the charge or attack the constitutionality of the statute under the Constitution, the earlier motion notwithstanding (neither does appellate defense counsel; consequently, we leave that question, if raised, for our superior courts).

Appellate government counsel rely on MANUAL FOR COURTS-MARTIAL (MCM), UNITED STATES (1995 ed.), RULE FOR COURTS-MARTIAL (R.C.M.) 910(j), in support of their argument that appellant's provident guilty pleas waived this issue. This argument is misplaced. A plea of guilty results in waiver under R.C.M. 910(j) solely with regard to matters relating to the factual issue of guilt of the offense in question. *Id.* In the instant case, however, whether appellant's plea is improvident, as appellate defense counsel aver, is a collateral question to whether the specification properly states a violation of the ACA. Therefore, the real issue is whether the specification in question states an offense of which a court-martial may take cognizance, at least with regards to the greater offense alleged. R.C.M. 905(b)(2) provides that defects in a specification may be addressed and resolved at any time during the proceedings. Indeed, the sufficiency of a specification may be attacked for the first time on appeal, although the standard of review is significantly less demanding. *Unit-ed States v. French,* 31 M.J. 57 (C.M.A.1990) and cases cited therein. Under these circumstances, appellant's provident pleas of guilty below did not waive or forfeit his standing to attack the efficacy of the specification. *Id.* at 59.

## II. ACA AND PREEMPTION

Article 134, Clause 3, commonly referred to as the *Crimes and Offenses Not Capital Clause,* incorporates by reference, all federal criminal statutes and those state laws made federal law via the ACA, if the *situs* of the crime is under either exclusive or concurrent federal jurisdiction. Article 134, UCMJ; MCM, Part IV, ¶ 60c.(4)(a). As mentioned, *ante,* appellant was charged under Clause 3 with manslaughter, in violation of Section 2903.04, OHIO REVISED CODE, assimilated by 18 U.S.C. § 13, which provides, in part, as follows:

§ 13. Laws of States adopted for areas within Federal jurisdiction.

(a) Whoever … is guilty of any act or omission which, although not made punishable by any enactment of Congress, would be punishable if committed or omitted within the jurisdiction of the State, Territory, Possession, or District in which such place is situated, by the laws thereof in force at the time of such act or omission, shall be guilty of a like offense and subject to a like punishment.

18 U.S.C. § 13(a).

Section 2903.04, OHIO REVISED CODE, provides as follows:

(A) No person shall cause the death of another, or the unlawful termination of another's pregnancy as a proximate result of the offender's committing or attempting to commit a felony.

(B) No person … as a proximate result of the offender's committing or attempting to commit a misdemeanor of the first, second, third, or fourth degree or a minor misdemeanor.

(C) Whoever violates this section is guilty of involuntary manslaughter. Violation of division (A) of this section is a felony of the first degree. Violation of division (B) of this section is a felony of the third degree.

The OHIO REVISED CODE further provides, in part, as follows:

2903.09. "Unlawful termination of another's pregnancy," "another's unborn", and "such other person's unborn" defined.

As used in Sections 2903.01 to 2903.08 ... of the REVISED CODE:

(A) "Unlawful termination of another's pregnancy" means causing the death of an unborn member of the species Homo Sapiens, who is or was carried in the womb of another, as a result of injuries inflicted during the period that begins with fertilization and that continues unless and until live birth occurs.

(B) "Another's unborn" or "such other person's unborn" means a member of the species Homo Sapiens, who is or was carried in the womb of another, during a period that begins with fertilization and that continues unless and until live birth occurs.

(C) Notwithstanding divisions (A) and (B) of this section, in no case shall the definitions of the terms "unlawful termination of another's pregnancy," "another's unborn," and "such other person's unborn" that are set forth in Division (A) of this section be applied or construed in any of the following manners:

(1) Except as otherwise provided in Division (C)(1) of this section, in a manner so that the offense prohibits or is construed as prohibiting any pregnant woman or her physician from performing an abortion with the actual consent of the pregnant woman, with the consent of the pregnant woman implied by law in a medical emergency, or with the approval of one otherwise authorized by law to consent to medical treatment on behalf of the pregnant woman. . . .

In addition to the requirement that the *situs* of the crime be subject to exclusive or concurrent federal jurisdiction, the ACA also requires that Congress must not have otherwise addressed the offense in question in order for it to be assimilated. 18 U.S.C. § 13; *United States v. Irvin*, 21 M.J. 184 (C.M.A.1986); *United States v. Williams*, 17 M.J. 207 (C.M.A.1984).

The latter requirement calls into play the so-called preemption doctrine. For our purposes, a state criminal statute may not be incorporated via Article 134 if the offense is otherwise proscribed by any of the enumerated punitive articles, Articles 77–132, UCMJ, 10 U.S.C.A. §§ 877, 932, or another federal criminal statute. *Irvin*, 21 M.J. at 188; *United States v. Wright*, 5 M.J. 106, 110–11 (C.M.A.1978); *United States v. Picotte*, 30 C.M.R. 196, 1961 WL 4422 (C.M.A. 1961). This restriction exists because the purpose of the ACA is not to enforce state law, but to fill gaps in the federal criminal law. *United States v. Rowe*, 32 C.M.R. 302, 310, 1962 WL 4491 (C.M.A.1962). These military precedents apply the requirements set forth in the seminal case on the ACA, *Williams v. United States*, 327 U.S. 711, 66 S.Ct. 778, 90 L.Ed. 962 (1946).

The facts in *Williams* are rather familiar. Williams had consensual sexual relations with a 17–year–old Indian female on an Indian Reservation in Arizona. He was prosecuted for violating the Arizona carnal knowledge statute, as assimilated under the ACA, because the Arizona statute set the age of consent at 18 years of age, whereas the federal statute set it at 16 years of age. Further, the Arizona statute carried a higher maximum punishment, including a substantial mandatory minimum punishment. The Supreme Court held that, once Congress has defined a criminal offense, a state statute may not be used to redefine or expand the offense in question or to enhance the maximum punishment. *Williams*, 327 U.S. at 723–24, 66 S.Ct. 778. The Court added that Williams' offenses were fully cognizable under the federal adultery and fornication statutes. And this, appellate defense counsel urge, is exactly the situation in the instant case.

Their brief avers that the government is limited solely to Article 119, UCMJ, which proscribes involuntary manslaughter, which requires the killing of a person as defined by federal law. They argue that the Ohio statute does not create a new offense, but only expands the definition of what constitutes a person. Consequently, they urge, the ACA cannot be used to eliminate the element of

the death of a living person. While appellate defense's position is alluring, we believe appellate government's position is more in line with our superior courts' construction of the ACA.

Appellate government counsel counters with the argument that there is no UCMJ provision which addresses "the specific misconduct committed by appellant, that is, the unlawful killing of an unborn fetus." Further, Article 119, UCMJ, they argue, "deals only with the 'killing of a human being,' commonly understood as a born, living person...." While appellate defense's position is alluring, we believe appellate government's position is more in line with our superior courts' construction of the ACA.

Appellate defense counsel's position essentially is Congress has preempted the field of homicide, period, and that using the Ohio statute is merely an attempt to eliminate the element of "death of a person." *See, e.g.,* *United States v. Norris,* 8 C.M.R. 36, 1953 WL 1616 (C.M.A.1953) (cannot use Article 134 to eliminate the specific intent elements in larceny and wrongful appropriation). This position, however, over emphasizes an offense's label or generic category at the expense of allowing a criminal offense to go unpunished. Historically, the Court of Military Appeals (now the United States Court of Appeals for the Armed Forces) has analyzed both an offense's generic category *and* whether a federal statute addressed the specific acts in question. We believe the latter has garnered the greater emphasis.

In *United States v. Fuller,* 25 C.M.R. 405, 406, 1958 WL 3182 (C.M.A.1958), the Court found no indication of Congressional intent to completely preempt the field of malicious burning via Article 126, UCMJ, and concluded that arson with the intent to defraud an insurance company was properly charged as service discrediting conduct under Article 134, UCMJ, Clause 2. In *Picotte,* 30 C.M.R. 196, the defense argued that Article 97, UCMJ (Unlawful Detention), precluded the assimilation of Colorado's kidnapping statute. The Court held Article 97 did not address kidnapping, and that "Congress has not made the precise criminal conduct of the accused punishable by Article 97 or any oth-

er specific article as distinguished from the general article of the Code." *Id.* at 198. Our superior court's focus on an accused's precise acts is not more evident than in *Wright,* 5 M.J. 106. There, the Court concluded that Articles 129 and 130, UCMJ, which prohibit burglary and housebreaking, respectively, did not prevent the assimilation of a Texas automobile burglary statute.

> Congress did not manifest an intention, as regards prosecution for unlawful entry with a criminal purpose, to limit the military to those structures and places enumerated in Articles 129 and 130 to the exclusion of other places and structures covered by civilian statutes included within the crimes and noncapital provision of Article 134.

*Id.* at 111.

This analysis also prevailed in *Irvin,* 21 M.J. 184. In *Irvin,* the accused was charged with assault under Article 128, UCMJ, and violating Colorado's child abuse statute under the ACA. After reviewing the state statute, then Chief Judge Everett concluded the military judge was correct in denying the motion to dismiss it, because it was broader than Article 128, in that it could be violated without committing an assault on the child. *Id.* at 189. Properly assimilated, Article 128 would be a lesser included offense for any assault, failing proof of the broader offense under the state statute. Applying *Williams,* 327 U.S. 711, 66 S.Ct. 778, 90 L.Ed. 962, the state offense was dismissed only because the court-martial's findings clearly were based on assaults against the child victim, which are covered by Article 128, UCMJ. *Id.* at 189, 66 S.Ct. 778; *see also United States v. Kline,* 21 M.J. 366 (C.M.A.1986) (Article 95, UCMJ, Resisting Apprehension, did not preclude assimilation of Maryland statute prohibiting eluding a police officer).

Our review of the Supreme Court's latest consideration of this issue in *Lewis v. United States,* 523 U.S. 155, 118 S.Ct. 1135, 140 L.Ed.2d 271 (1998) convinces us further that Ohio's fetal homicide statute was properly assimilated. Neither appellate government nor appellate defense counsel had the benefit of this decision when they prepared their respective briefs.

Lewis and her husband were prosecuted in federal court for killing her husband's 4–year–old daughter while they lived on Fort Polk, Louisiana. Lewis was charged under the ACA with violating Louisiana's first degree murder statute, which defined first degree murder, in part, as killing with the specific intent to kill or inflict bodily harm upon a victim less than 12 years of age or 65 years of age or older. Obviously, this statute makes it much easier to prove first degree murder, as opposed to the federal statute, which requires proof of premeditation in addition to the other elements.

Before addressing the specific case before it, the Court observed what it believed to be two critical factors impacting a proper construction and application of the ACA. First, the Court agreed with the Solicitor General that the phrase, "not made punishable by *any enactment of Congress*" (emphasis in original), if applied literally, would defeat the congressional intent of using state law to fill gaps in the federal criminal law. Specifically, the fact that the Lewises could be prosecuted under the federal assault law or even the federal murder statute did not, *ipso facto*, preclude the assimilation of the Louisiana law. *Lewis*, 523 U.S. at ——, 118 S.Ct. at 1139–40. On the other hand, the Court rejected the Solicitor General's "precise acts" test, which, in actuality was akin to a *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), elements test fine tuned for ACA application. *See, e.g., Lewis*, 523 U.S. at ——, 118 S.Ct. at 1149–50 (Kennedy, J., dissenting). The Court concluded that such an elements test would result in too broad a reach of the ACA. *Lewis*, 523 U.S. at ——, 118 S.Ct. at 1140–41; *see also Lewis*, 523 U.S. at ——, 118 S.Ct. at 1147–48 (Scalia, J., concurring).

Instead, the Court readopted the existing two-step test for assimilation, but with further clarification of step two, as follows:

[A] court must first asked the question that the ACA's language requires: Is the defendant's "act or omission ... made punishable by *any* enactment of Congress." 18 U.S.C. § 13(a). *If the answer to this question is "no," that will normally end the matter.* The ACA presumably would assimilate the statute. If the answer to the question is "yes," however, the court must ask the further question whether the federal statutes that apply to the "act or omission" preclude application of the state law in question, say because its application would interfere with the achievement of a federal policy, because the state law would effectively rewrite an offense definition that Congress carefully considered, or because federal statutes reveal an intent to occupy so much of a field as would exclude use of the particular state statute at issue.... [T]he Act will not apply where both state and federal statutes seek to punish approximately the same wrongful behavior—where, for example, differences among elements of the crime reflect jurisdictional, or other technical, considerations, or where differences amount only to those of name, definitional language, or punishment.

The Act's basic purpose makes it similarly clear that assimilation may not rewrite distinctions among the forms of criminal behavior that Congress intended to create. Hence, ordinarily, there will be no gap for the Act to fill where a set of federal enactments taken together make criminal a single form of wrongful behavior while distinguishing (say, in terms of seriousness) among what amount to different ways of committing the same basic crime.

At the same time, a substantial difference in the kind of wrongful behavior covered (on the one hand by the state statute, on the other, by federal enactments) will ordinarily indicate a gap for a state statute to fill—unless Congress, through the comprehensiveness of its regulation, or through language revealing a conflicting policy, indicates to the contrary in a particular case. The primary question (we repeat) is one of legislative intent: Does applicable federal law indicate an intent to punish conduct such as the defendant's to the exclusion of the particular state statute at issue?

*Id.* 523 U.S. at ——, 118 S.Ct. at 1141–42 (citations omitted) (emphasis added).

Applying these principles and *Williams*, the Court held that the government could not eschew the federal murder statute simply

because Louisiana's definition of first degree murder was broader than that of the federal statute, which also included first degree murder. The fact that the prosecution's evidence could only prove unpremeditated murder under the federal statute did not change the result, because the Court concluded that the federal murder statute reflected a Congressional intent to completely preempt the field of murder:

[The federal murder statute] purports to make criminal *a particular form of wrongful behavior,* namely 'murder,' which it defines as the 'unlawful killing of a human being with malice aforethought.' It covers all variants of murder.... The complete coverage of the federal statute over all types of federal enclave murder is reinforced by the extreme breadth of the possible sentences, ranging all the way from *any* term of years, to death. *There is no gap for Louisiana's statute to fill.*

*Lewis,* 523 U.S. at ——, 118 S.Ct. at 1144 (first and last emphasis added, middle emphasis in original).

We now apply this guidance to the instant case. First, the fact that appellant's assault of KAR is precluded by Article 128 and he will be punished for that crime does not preclude assimilation of the Ohio statute. *Lewis,* 523 U.S. at ——, 118 S.Ct. at 1140; *see also United States v. Kaufman,* 862 F.2d 236, 237–38 (9th Cir.1988); *Fields v. United States,* 438 F.2d 205, 207–08 (2d Cir.1971). Therefore, we ask: does Article 119, which prohibits involuntary manslaughter, punish appellant's act or omission? We believe not. Although the Ohio offense is placed within its homicide statutory scheme, the specific act prohibited is the unlawful termination of another's pregnancy while committing a criminal offense. Federal homicide statutes reach only the killing of a *born* human being. So, while Congress has covered the field with regards to the killing of any person after birth, *Lewis,* 523 U.S. at ——, 118 S.Ct. at 1144; *United States v. Spencer,* 839 F.2d 1341 (9th Cir.1988), it has not spoken with regard to the protection of an unborn person. In fact, the protection of the unborn is an area historically left to the several states' police power. *See Roe v. Wade,* 410 U.S.

113, 163–64, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) ("If the State is interested in protecting fetal life after viability, it may go so far as to proscribe abortion during that period, except when it is necessary to preserve the life or health of the mother."). Therefore, we do not discern any overriding congressional policy in this area which preempts assimilation of the state statute.

Without regard to any lesser included offense, if appellant is not punished under the Ohio fetal homicide statute, he will go unpunished for the specific act of unlawfully terminating KAR's pregnancy while committing a criminal offense. *Ergo,* there is a gap in the federal law. *Cf. Lewis,* 523 U.S. at ——, 118 S.Ct. at 1144; *Williams,* 327 U.S. at 723, 66 S.Ct. 778 (Williams' specific act of illicit sex with the female in question was punishable by the federal fornication and adultery statutes; although subject to a lesser punishment, his act would not go unpunished). We doubt that Congress would countenance a military base being a safe haven for personnel who unlawfully cause the termination of another's pregnancy while committing a criminal act, while the local state citizens "just outside the gate" do not enjoy a similar immunity. *See United States v. Borys,* 40 C.M.R. 259, 266, 1969 WL 6061 (C.M.A.1969) (Quinn, C.J., dissenting).

Another factor mitigating against our holding otherwise is that, had Ohio placed this statute in another section or a stand-alone section of its criminal code, say, for example, as part of its child protection statutes, the question of assimilation would be almost rhetorical. *Irvin,* 21 M.J. at 189; *see also United States v. Fesler,* 781 F.2d 384, 390–91 (5th Cir.1986); *United States v. Brown,* 608 F.2d 551, 553–54 (5th Cir.1979). Even if we were to hold otherwise, it would not be of substantive benefit to appellant because, during the inquiry into his guilty plea, *see Care,* 40 C.M.R. 247 (C.M.A.1969), he admitted to a lesser included offense of service discrediting conduct under Article 134, Clause 2.

Clause 3 of Article 134, UCMJ, does not include conduct prejudicial to good order and discipline or service discrediting as elements of any offense alleged. *Irvin,* 21 M.J. at 189 n. 9. Nonetheless, while advising appellant

of the elements of the Ohio statute, the military judge informed appellant that his acts had to constitute conduct prejudicial to good order and discipline or to the discredit of the Air Force. Appellant specifically stated he was guilty of both, in addition to the elements of the Ohio statute. Given these fully informed judicial admissions, and our conclusion on the preemption issue, we could approve a lesser included offense under Article 134, UCMJ, Clause 2, service discrediting conduct. *See Irvin,* 21 M.J. at 189; *Williams,* 17 M.J. at 215–16. However, we need not address that possibility at this juncture, as we hold the Ohio statute was properly assimilated into federal law.

### III. RECUSAL OF MILITARY JUDGE

During the preliminary proceedings prior to arraignment, the military judge informed counsel and the appellant that, during a prior marriage, approximately 13 years earlier, she had been the victim of spousal abuse. She provided counsel with copies of a *voir dire* of her at another court-martial, and answered a detailed *voir dire* by civilian trial defense counsel. Neither counsel was aware of this facet of the military judge's past prior to her disclosure. The military judge assured them that she had completely placed the experience behind her with the benefit of counselling, etc. Further, she explained that she had defended as well as prosecuted spouse abusers, and she gave her complete dedication as an advocate to whichever client she happened to represent. The incident happened some 13 years or so earlier, and that it would play no role in her deliberations. After the *voir dire,* she denied a defense request that she recuse herself.

First, we assume *arguendo* for purposes of this decision that appellant did not waive the issue by opting for trial by military judge alone. *See United States v. Sherrod,* 22 M.J. 917, 921–22 (A.C.M.R.1986), *aff'd in part, rev'd in part,* 26 M.J. 30 (C.M.A.1988). Our standard of review of this issue is abuse of discretion. Although it is not entirely clear that the military judge used the correct legal standard for her decision, we, nonetheless, find no error in her refusal to recuse herself,

as we find that her impartiality might not reasonably be questioned.

Civilian trial defense counsel challenged the military judge under R.C.M. 902(a), which provides that, "a military judge shall disqualify himself or herself in any proceeding in which that military judge's impartiality might reasonable be questioned." Prior to ruling on the challenge, the military judge thoroughly reviewed the specific grounds for recusal of R.C.M. 902(b), and ruled that none of those, *e.g.,* personal bias and the statutory disqualifications, applied to her. When it came specifically to R.C.M. 902(a), however, the military judge ruled:

> *I don't believe* that my ability to be fair and impartial has *reasonably* been questioned. To suggest that a military judge, who more than ten years ago was the victim of any offense would be unable to serve, would perhaps disqualify many judges across this nation from being able to serve.... As I indicated in *voir dire,* and I believe in the manner in which I've dealt with this entire issue, *I believe I can be fair and impartial,* and I will do so.

(Emphasis added.)

Her use of the term "reasonably" indicates an objective test is being applied to determine her impartiality. The entire quoted portion of her ruling, however, seems to suggest that she applied a subjective test rather than the required objective test. Fueling the uncertainty is civilian trial defense counsel's final question of the military judge during *voir dire:* "whether those reasonable people [having heard all facts] might disagree to an impropriety [sic] of a judge with a history of spouse abuse sitting in a judge alone court-martial, in a case involving assault on a spouse." The military judge answered, "I think reasonable people might differ."

 As the plain terms of R.C.M. 902(a) reflect, it is not the military judge's, or even appellant's, personal belief which decides the issue. *See also* Department of The Judge Advocate General Operating Instruction No. 04, *Uniform Code of Judicial Conduct for Military Trial and Appellate Judges,* Canon 3E (15 February 1991). Whether a military judge's impartiality might reasonably be questioned is an objective test. *United*

*States v. Kincheloe,* 14 M.J. 40, 50 (C.M.A. 1982) and cases cited therein; *Sherrod,* 22 M.J. at 920. Would a reasonable person, with knowledge of *all* of the applicable facts, have a reasonable doubt regarding the military judge's impartiality? *Kincheloe,* 14 M.J. at 50; *Sherrod,* 22 M.J. at 920. Further, military judges must remember that the issue is not whether it is fair that the particular appearance of impartiality has been raised, but how the nature or character of the particular appearance may impact a reasonable person. *See Wright,* 5 M.J. at 112 (Perry, J., concurring). Nonetheless, a military judge has an equally weighty responsibility not to recuse himself or herself unnecessarily. *Kincheloe,* 14 M.J. at 50 n. 14.

The military judge's response that "reasonable people might differ" approaches the military judge's conclusion in *Sherrod,* which, under the circumstances, resulted in his being disqualified and all proceedings of the court-martial, from that point, being a nullity. *Sherrod,* 26 M.J. at 33. The facts in *Sherrod,* however, were significantly different. There, the military judge specifically found that a reasonable person might reasonably question his impartiality, and he denied the accused's request to be tried by military judge alone as a result. *Sherrod,* 22 M.J. at 919. Further, based on the entire *voir dire* in the instant case, we believe the military judge's response was more along the line of, "anything is possible."

▮ In view of a military judge's obligation not to recuse himself or herself unnecessarily, it is axiomatic that, the mere fact that a military judge has been the victim of the type offense with which an accused is charged, standing alone, will not constitute sufficient grounds for recusal. *See generally United States v. Fiat Motors,* 512 F.Supp. 247 (D.D.C.1981). Nonetheless, henceforth, whenever faced with this infrequent basis for challenge, military judges will apply the following test to assist them in their ruling. When the military judge is asked to recuse himself or herself because he or she was the victim of a similar offense, the following factors must be weighed and balanced by the military judge, as follows: 1) the time frame of the offense; was the military judge victim-

ized in the very recent past or the distant past?; 2) were the facts and surrounding circumstances of the crime especially egregious so as to inflame one's emotions at the expense of one's judicial instincts when recalling the event?; and, 3) if the answer to 2 is yes, would a reasonable person with knowledge of all of the relevant facts conclude that sufficient time has passed whereby the military judge's judicial instincts and temperament are no longer compromised?

▮ Applying this test, we conclude that a reasonable person hearing the entire *voir dire* would not have a reasonable doubt as to the military judge's impartiality. First, the events in question occurred 13 years prior to the trial. Second, it is clear from the military judge's responses that she was in no way inflamed at the prospect of being confronted with an instance of spouse abuse. Third, even if she were, at some point in her past, inflamed by her personal experience, we find that a reasonable person would conclude from her answers that she has put the experience behind her and moved on. While there may be a case of a military judge being the victim of a crime so egregious *and* which occurred so close in time to a trial of the same offense that any reasonable person would conclude that the judge should not sit on that type of case, this case falls way short of that situation.

We agree, fully, with the military judge that a reasonable person understands that judges are not grown in, and harvested from, a sterile, idyllic existence frequently referred to as the "ivory tower." In fact, our national experience supports the opposite conclusion, which is that the average citizen, civilian or military, prefers judges with real-life experiences. The military judge was correct not to recuse herself.

## IV. REMAINING ISSUES

We have considered appellant's two remaining assignments of error and resolved them against him. Article 40, UCMJ; R.C.M. 906(b)(1); *United States v. Carter,* —— M.J. —— No. 97–1121/AF (April 16, 1998); *United States v. Carter,* —— M.J. —— No. 98–5003/AF (April 16, 1998); *United States v. Gorski,* 47 M.J. 370 (1997).

*V. Decretal*

Accordingly, the findings and sentence are correct in law and fact, Article 66(c), UCMJ, and are hereby

AFFIRMED.

Judges SENANDER and MORGAN concur.