UNITED STATES, Appellee,

v.

James R. NEEDHAM, Staff Sergeant,
U.S. Air Force, Appellant.

No. 51,565.
ACM 24416.

U.S. Court of Military Appeals.

March 30, 1987.

For Appellant: *Major Deborah A. Baker* (argued); *Colonel Leo L. Sergi* and *Major Conrad C. Baldwin, Jr.* (on brief); *Captain Robert S. Schwartz.*

For Appellee: *Captain Marc Van Nuys* (argued); *Colonel Kenneth R. Rengert* (on brief); *Colonel Andrew J. Adams, Jr.*

## OPINION OF THE COURT

SULLIVAN, Judge:

Appellant was tried by general court-martial at Mountain Home Air Force Base, Idaho. Pursuant to his pleas, he was found guilty of wrongful distribution of lysergic acid diethylamide (LSD), wrongful possession of marihuana, and two specifications of wrongful use of marihuana, in violation of Article 134, Uniform Code of Military Justice, 10 U.S.C. § 934. He was sentenced by a panel of officer members to

**384**

a bad-conduct discharge, confinement for 15 months, forfeiture of $300.00 pay per month for 15 months, and reduction to airman basic. The convening authority approved, and the Court of Military Review affirmed, the findings and sentence. 19 M.J. 640.

We granted review of the following issue:

WHETHER THE MILITARY JUDGE ERRED BY ADMITTING INTO EVIDENCE FOR SENTENCING APPELLATE EXHIBITS II AND III (EXCERPTS FROM *DRUG ENFORCEMENT* MAGAZINE AS TO LSD AND MARIHUANA, RESPECTIVELY).

The facts of this case are as follows: On July 8, 1983, appellant and two companions drove off Mountain Home Air Force Base to an abandoned Titan III missile site to smoke a joint of marihuana. Then on July 13, 1983, appellant transferred four hits of LSD to an informant for the Air Force Office of Special Investigations (OSI). This transaction took place at appellant's on-base residence under controlled OSI observation. The informant turned the drugs over to a special agent, who in turn forwarded the items to the laboratory for testing. Three of the four items were consumed in testing. The fourth was introduced as a prosecution exhibit. Finally, appellant admitted, after proper rights' advisement, to using and possessing marihuana in his residence during the month of November 1983. He consented to a search of his residence which produced, among other things, drug paraphernalia and marihuana residue in many forms. Appellant also tested positive for tetrahydrocannabinol (THC) by urinalysis.

During presentencing, trial counsel requested the military judge to take judicial notice of two extracts (attached to the record as Appellate Exhibits II and III and appended to this opinion) from *Drug Enforcement* magazine, a periodical published by the Drug Enforcement Agency, Department of Justice. One offers an analysis of the history, nature, and effects of LSD use,

while the other discusses the same with respect to marihuana use. Over defense objections under Mil.R.Evid.* 201 (dealing with judicial notice), 401 and 402 (on the question of relevance), and 403 (as to probative value), the military judge edited portions of the extracts and took judicial notice of the remainder. Trial counsel was then only allowed to read the retained portions to the court members. Later, those members were instructed to consider what was read to them as evidence with the understanding that they did not have to accept the contents as conclusive.

■ We agree with the court below and reject appellant's argument that such evidence is irrelevant for sentencing because he was convicted of distributing, not using, LSD. In *United States v. Vickers*, 13 M.J. 403, 406 (C.M.A.1982), Chief Judge Everett expressed the unanimous view that

regardless of the plea, the prosecution after findings of guilty may present evidence which is directly related to the offense for which an accused is to be sentenced so that the circumstances surrounding that offense or its repercussions may be understood by the sentencing authority.

In the instant case, appellant distributed LSD to a fellow servicemember who could have been a user or could have been a subsequent distributor to other servicemembers. Such a potential for harm is a circumstance surrounding the offense and, therefore, properly before the sentencing authority. To hold otherwise would require the trier-of-fact to operate in a vacuum and be insulated from the reality of the drug epidemic in our society. Its admission is consistent with the need to afford those vested with sentencing responsibility available information which addresses all the aspects of the crime so that an appropriate punishment may be decided.

■ We also reject appellant's Mil.R. Evid. 403 argument that the prejudicial effect of this information far outweighs "its probative value." Obviously, this type of

---

\* Manual for Courts-Martial, United States, 1969    (Revised edition).

information does not help the defense cause and as such is prejudicial. However, it was not "unduly" prejudicial. *See United States v. Abel,* 469 U.S. 45, 55, 105 S.Ct. 465, 470, 83 L.Ed.2d 450 (1984). We find no abuse of discretion under Mil.R.Evid. 403 in the military judge's decision to admit this evidence.

■ That brings us to the real question in this case: Are the exhibits proper matters for judicial notice under Mil.R.Evid. 201, entitled "Judicial Notice of Adjudicative Facts"? Under subsection (b) the following language appears:

A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known universally, locally, or in the area pertinent to the event or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.

Appellant generally states that "some" of the facts in the exhibits are subject to reasonable dispute, without further defining the alleged gray areas. He also complains that he was denied a confrontation right by failure to disclose the identity of the persons making the assessments displayed in the exhibits. He cites *Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980); *United States v. Williams,* 17 M.J. 207 (C.M.A.1984); *United States v. Brown,* 11 M.J. 263 (C.M.A. 1981).

We have some doubt whether a Drug-Enforcement-Administration publication, as compared to a learned treatise, meets the source requirement of Mil.R.Evid. 201(b)(2) in the context of a drug prosecution. However, it is not clear on the record whether this publication was a source within the meaning of this prong of the rule or simply a convenient vehicle for communicating facts to be judicially noticed under Mil.R. Evid. 201(b)(1). In any event, this issue was not adequately developed at trial and

has not been directly pursued on appeal. Mil.R.Evid. 103(a)(1).

Turning to appellant's specific claims, we note that resolution of this case would necessarily require consideration of the entire record of trial for prejudice. *See* Mil.R. Evid. 103(a). Certain actions taken by the military judge which dampen the effects of the extracts and by defense counsel which reflect an absence of prejudice are readily apparent. First, the members never saw the exhibits because the judge limited trial counsel to oral presentation only. Second, the military judge at the request of the defense deleted what he believed to be irrelevant portions from the extracts. In accord with our earlier discussion on relevance, we believe he excluded all that was necessary. Third, the military judge instructed the members that they could consider the matters judicially noticed, but they did not have to accept them as conclusive. Fourth, prior to taking judicial notice, the military judge provided defense counsel with a fair opportunity to challenge the matters asserted in the extracts. Both extracts contain background information, the accuracy of which could be easily verified or challenged by reference to medical or pharmaceutical literature. Fifth, we note that the record shows that appellant did not at trial, and does not on appeal, identify as inaccurate any of the unedited statements in the extracts. If the true question on this appeal is one involving reliability of information, then appellant did have an adequate opportunity to "set the record" straight. At best, his failure to seize upon the opportunity to meaningfully respond in these circumstances suggests that any error which may have occurred was harmless. We so hold.

The decision of the United States Air Force Court of Military Review is affirmed.

Chief Judge EVERETT and Judge COX concur.

# APPENDIX

EXTRACT OF DRUG ENFORCEMENT
Vol. 6, No. 2, July 1979
Drug Enforcement Administration
U.S. Department of Justice,
Washington, D.C.

## Appellate Exhibit II

***************

The assistant Attorney General for Administration has determined that the publication of this periodical is necessary in the transaction of the public business required by law of the Department of Justice.

***************

DRUGS OF ABUSE

HALLUCINOGENS
Natural and
synthetic substances
that distort the perception of reality

Hallucinogenic drugs, both natural and synthetic, are substances that distort the perception of objective reality. They induce a state of excitation of the central nervous system, manifested by alterations of mood, usually euphoric, but sometimes severely depressive. Under the influence of hallucinogens, the pupils dilate, and body temperature and blood pressure rise. The senses of direction, distance, and time become disoriented. A user may speak of "seeing" sounds and "hearing" colors. If taken in a large enough dose, the drug produces delusions and visual hallucinations. Occasionally, depersonalization and depression are so severe that suicide is possible, but the most common danger is impaired judgment, leading to rash decisions and accidents. Persons in hallucinogenic states should therefore be closely supervised, and upset as little as possible, to keep them form harming themselves and others. Acute anxiety, restlessness, and sleeplessness are common until the drug wears off.

Long after hallucinogens are eliminated from the body, users may experience "flashbacks" - fragmentary recurrences of psychedelic effects - such as the intensification of perceived color, the apparent motion of a fixed object, or the mistaking of one object for another. Recurrent use produces tolerance, which tends to encourage resorting to greater amounts. Although no evidence of physical dependence is detectable when the drugs are withdrawn, recurrent use tends to produce psychic dependence, varying according to the drug, the dose, and the individual user. It should be stressed that the hallucinogens are unpredictable in their effects each time they are used.

The abuse of hallucinogens in the United States reached a peak of popularity in the late 1960s, and a subsequent decline was attributed to broader awareness of their hazardous effects. The abuse, however, re-emerged in the late 1970s.

***************

LSD (LSD-25, lysergide)

LSD is an abbreviation of the German expression for lysergic acid diethylamide. It is produced from lysergic acid, a substance derived from the ergot fungus which grows on rye or from lysergic acid amide, a chemical found in morning glory seeds; both of the precursor chemicals are in Schedule III of the CSA. It was first synthesized in 1938. It psychotomimetic effects were discovered in 1943 when a chemist accidentally took some LSD. As he began to experience the effects now known as a "trip", he was aware of vertigo and an intensification of light; closing his eyes, he saw a stream of fantastic images of extraordinary vividness accompanied by a kaleidoscopic play of colors. This condition lasted for about two hours.

Because of the extremely high potency of LSD, its structural relationship to a chemical which is present in the brain, and its similarity in effects to certain aspects of psychosis, LSD was used as a tool of research to study the mechanism of mental illness. It was later adopted by the drug culture. Although its popularity declined after the 1960s, there are indications that its illicit use is once again increasing.

LSD is usually sold in the form of tablets, thin squares of gelatin ("window panes"), or impregnated paper ("blotter acid"). The average effective oral dos is from 30 to 50 micrograms, but the amount per dosage unit varies greatly. The effects of higher doses persist for 10 to 12 hours. Tolerance develops rapidly.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

---

## Appellate Exhibit III
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### DRUGS OF ABUSE

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Cannabis sativa L., the hemp plant, grows wild throughout most of the tropic and temperate regions of the world. It is a single species. This plant has long been cultivated for the tough fiber of the stem, the seed used in feed mixtures, and the oil as an ingredient of paint, as well as for its biologically active substances,most highly concentrated in the leaves and resinous flowering tops.

The plant material has been used as a drug for centuries. In 1889 it entered the annals of western medicine with the publication of an article surveying its therapuetic potential, including possible uses as an analgesic and anticonvulsant agent. It was alleged to be effective in treating a wide range of physical and mental ailments during the remainder of the 19th century. With the introduction of many new synthetic drugs in the 20th century, interest in it as a medication waned. The controls imposed with the passage of the Marihuana Tax Act of 1937 further curtailed its use in treatment, and by 1941 it had been deleted from the U.S. Pharacopoeia and the National Formulary, the official compendia of drugs. But advances continued to be made in the chemistry of cannabis. Among the many cannabinoids synthesized by the plant are cannabinol, cannabidiol, cannabinolidic acids, cannabigerol, cannabichromene, and several isomers of tetrahydrocannabinol, one of which is believed responsible for most of its characteristic psychoactive effects. This is delta-9-tetra-hydrocannabinol (THC), one of 61 cannabinoids, which are unique chemicals found only incannabis.

Cannabis products are usually smoked in the form of loosely rolled cigarettes ("joints"). They may be used alone or in combination with other substances. They may also be administered orally, but are reported to be about three times more potent when smoked. The effects are felt within minutes, reach their peak in 10 to 30 minutes, and may linger for two or three hours. A condensed description of these effects is apt to be inadequate or even misleading, so much depends upon the experience and expectations of the individual as well as the activity of the drug itself. Low doses tend to induce restlessness and an increasing sense of well-being, followed by a dreamy state of relaxation, and frequently hunger, especially a craving for sweets. Changes of sensory perception-- a more vivid sense of sight, smell, touch, taste, and hearing-- may be accompanied by subtle alterations in thought formation and expression. Stronger doses intestify these reactions. The individual may experience shifting sensory imagery, rapidly fluctuating emotions, and a flight of fragmentary thoughts with disturbed associations; an altered sense of self-identity; impaired memory, and a dulling of attention despite an illusion of heightened insight. This state of intoxication may not be noticeable to an observer. ~~High doses may result in image distortions, a loss of personal identity, fantasies and hallucinations, and very high doses in a toxic psychosis.~~

During the past ten years there has been a resurgence in the scientific study of cannabis, one goal of which has been to develop therapeutic agents which , if used as directed in medical treatment, will not produce harmful side effects. While THC can now be synthesized in the laboratory, it is liquid insoluble in water, and it decomposes on exposure to air and light, so that it is difficult to prepare stable dosage units. Two of the most active areas of research are for the control of nausea and vomiting caused by chemotherapeutic agents used in the treatment of cancer and for decreasing intraocular pressure in the treatment of glaucoma. None of the synthetic cannabinoids have so far been detected in the drug traffic.

388

Three types of drugs that come from cannabis are currently distributed on the U.S. illicit market. Having no currently accepted medical use in treatment in the United States, they remain under Schedule I of the CSA.

## Marihuana

The term marihuana (or marijuana) is used in this country to reflect the cannabis plant and to any part or extract of it that produces somatic or psychic changes in man. A tobacco like substance produced by drying the leaves and flowering tops of the plant, marihuana varies significantly in its potency, depending on the source and selectivity of plant materials used. Most wild U.S. cannabis is considered inferior because of a low concentration of THC, usually less than 0.5 percent. Jamaican, Colombian, and Mexican varieties range between 0.5 and 4 percent. The most selective product is reputed to be Sinsemilla (Spanish, sin semilla: without seed), prepared from the unpollenated female cannabis plant, samples of which have been found to contain up to 6 percent THC. Southeast Asian "Thai sticks", consisting of marihuana buds bound onto short sections of bamboo, are also encountered infrequently on the U.S illicit market.

***************