UNITED STATES, Appellee,

v.

Gregory L. ROBBINS, Airman,
U.S. Air Force, Appellant.

No. 98–1061.
Crim.App. No. 32613.

U.S. Court of Appeals for
the Armed Forces.

Argued May 12, 1999.

Decided Sept. 30, 1999.

GIERKE, J., delivered the opinion of the Court, in which COX, C.J., and CRAWFORD and EFFRON, JJ., joined. SULLIVAN, J., filed an opinion concurring in the result.

For Appellant: *Colonel Douglas H. Kohrt* (argued).

For Appellee: *Captain Martin J. Hindel* (argued); *Colonel Anthony P. Dattilo* and *Major Ronald A. Rodgers* (on brief).

Judge GIERKE delivered the opinion of the Court.

A military judge sitting as a general court-martial convicted appellant, pursuant to his pleas, of assault and battery on his wife on divers occasions and intentional infliction of grievous bodily harm on his wife, in violation of Article 128, Uniform Code of Military Justice, 10 USC § 928, as well as involuntary manslaughter by terminating the pregnancy of his wife, in violation of § 2903.04 of the Ohio Revised Code, as assimilated into Article 134, UCMJ, 10 USC 934, by the Federal Assimilative Crimes Act (ACA), 18 USC § 13. The adjudged and approved sentence provides for a dishonorable discharge, confinement for 8 years, and reduction to the lowest enlisted grade. The Court of Criminal Appeals affirmed the findings and sentence. 48 MJ 745 (1998).

This Court granted review of the following issue:

WHETHER APPELLANT'S PLEA OF GUILTY TO CHARGE II (RENUMBERED) AND ITS SPECIFICATION IS IMPROVIDENT SINCE THE PREEMPTION DOCTRINE APPLIES TO THIS CHARGE WHICH WAS BROUGHT UNDER THE ASSIMILATIVE CRIMES ACT.

For the reasons set out below, we affirm.

The facts of this case are not disputed. Appellant severely beat his wife with his fists, punching her in the face and body. She was approximately 34 weeks pregnant. Appellant broke his wife's nose and blackened her eye. His punches to her body ruptured her uterus and tore the placenta from the uterine wall. The unborn baby, who was otherwise healthy, was expelled into the mother's abdominal cavity and died before birth.

Appellant now argues that his guilty plea to involuntary manslaughter by the unlawful termination of his wife's pregnancy was improvident because the offense cannot be assimilated into Article 134. Thus, he argues, the offense was not cognizable under the UCMJ. The Government argues that the offense was properly assimilated and that appellant's guilty plea waived any issue of preemption.

■ We hold that the preemption issue was not waived by appellant's guilty plea. RCM 910(j), Manual for Courts–Martial, United States (1995 ed.),* provides that a guilty plea "waives any objection ... insofar as the objection relates to the factual issue of guilt of the offense(s) to which the plea was made." RCM 905(e) provides that lack of jurisdiction or failure to state an offense are not waived by failure to raise the issue at trial. In this case, the issue relates to subject-matter jurisdiction. If the offense was improperly assimilated, it was not cognizable by a court-martial. Thus, we hold that the preemption issue was not waived by the

guilty plea or appellant's failure to raise it at trial.

■ Article 134 provides in pertinent part as follows:

Though not specifically mentioned in this chapter, ... all crimes and offenses not capital, of which persons subject to this chapter may be guilty, shall be taken cognizance of by a general, special, or summary court-martial, according to the nature and degree of the offense, and shall be punished at the discretion of that court.

Title 18, USC, § 13(a), the ACA provides as follows:

Whoever ... is guilty of any act or omission which, although not made punishable by any enactment of Congress, would be punishable if committed or omitted within the jurisdiction of the State, Territory, Possession, or District in which such place is situated, by the laws thereof in force at the time of such act or omission, shall be guilty of a like offense and subject to a like punishment.

The assimilation of state criminal statutes is limited by paragraph 60c(5)(a), Part IV, Manual, *supra*, which provides as follows:

The preemption doctrine prohibits application of Article 134 to conduct covered by Articles 80 through 132. For example, larceny is covered in Article 121, and if an element of that offense is lacking—for example, intent—there can be no larceny or larceny-type offense, either under Article 121 or, because of preemption, under Article 134. Article 134 cannot be used to create a new kind of larceny offense, one without the required intent, where Congress has already set the minimum requirements for such an offense in Article 121.

In *United States v. Kick*, 7 MJ 82, 85 (1979), this Court explained the preemption doctrine as follows:

[P]reemption is the legal concept that where Congress has occupied the field of a given type of misconduct by addressing it

---

* All Manual provisions are cited to the version applicable at the time of trial. The 1998 version is unchanged unless otherwise indicated.

in one of the specific punitive articles of the code, another offense may not be created and punished under Article 134, UCMJ, by simply deleting a vital element. However, simply because the offense charged under Article 134, UCMJ, embraces all but one element of an offense under another article does not trigger operation of the preemption doctrine. In addition, it must be shown that Congress intended the other punitive article to cover a class of offenses in a complete way.

(Citations omitted.)

In *United States v. McGuinness*, 35 MJ 149 (1992), this Court held that the preemption doctrine precluded assimilation if two questions are answered in the affirmative:

The primary question is whether Congress intended to limit prosecution for wrongful conduct within a particular area or field to offenses defined in specific articles of the Code; the secondary question is whether the offense charged is composed of a residuum of elements of a specific offense and asserted to be a violation of either Articles 133 or 134, which, because of their sweep, are commonly described as the general articles.

*Id.* at 151–52, quoting *United States v. Wright*, 5 MJ 106, 110–11 (CMA 1978).

In *Williams v. United States*, 327 U.S. 711, 66 S.Ct. 778, 90 L.Ed. 962 (1946), the Supreme Court held that the ACA could not be used to redefine and enlarge the offense of carnal knowledge under the federal Criminal Code by assimilating an Arizona statute. The federal statute required proof that the girl was under the age of 16, and the Arizona statute required proof that the girl was under the age of 18. The Supreme Court said:

We hold that the Assimilative Crimes Act does not make the Arizona statute applicable in the present case because (1) the precise acts upon which the conviction depends have been made penal by the laws of Congress defining adultery, and (2) the offense known to Arizona as that of "statutory rape" has been defined and prohibited by the Federal Criminal Code, and is not to be redefined and enlarged by application to it of the Assimilative Crimes Act.

The fact that the definition of this offense as enacted by Congress results in a narrower scope for the offense than that given to it by the State, does not mean that the congressional definition must give way to the State definition. This is especially clear in the present case because the specified acts which would come within the additional scope given to the offense by the State through its postponement of the age of consent of the victim from 16 to 18 years of age, are completely covered by the federal crimes of adultery or fornication. The interesting legislative history of the Assimilative Crimes Act discloses nothing to indicate that, after Congress has once defined a penal offense, it has authorized such definition to be enlarged by the application to it of a State's definition of it.... [T]he Assimilative Crimes Act has a natural place to fill through its supplementation of the Federal Criminal Code, without giving it the added effect of modifying or repealing existing provisions of the Federal Code.

*Id.* at 717–18, 66 S.Ct. 778 (footnotes omitted).

In *Lewis v. United States*, 523 U.S. 155, 118 S.Ct. 1135, 140 L.Ed.2d 271 (1998), the Supreme Court laid out the relevant analysis for determining whether assimilation is permissible. It stated:

In our view, the ACA's language and its gap-filling purpose taken together indicate that a court must first ask the question that the ACA's language requires: Is the defendant's "act or omission ... made punishable by *any* enactment of Congress." 18 U.S.C. § 13(a)(emphasis added). If the answer to this question is "no," that will normally end the matter. The ACA presumably would assimilate the statute. If the answer to the question is "yes," however, the court must ask the further question whether the federal statutes that apply to the "act or omission" preclude application of the state law in question, say, because its application would interfere with the achievement of a federal policy, because the state law would effectively rewrite an offense definition that

Congress carefully considered, or because federal statutes reveal an intent to occupy so much of a field as would exclude use of the particular state statute at issue. . . .

\* \* \*

The Act's basic purpose makes it similarly clear that assimilation may not rewrite distinctions among the forms of criminal behavior that Congress intended to create. Hence, ordinarily, there will be no gap for the Act to fill where a set of federal enactments taken together make criminal a single form of wrongful behavior while distinguishing (say, in terms of seriousness) among what amount to different ways of committing the same basic crime.

At the same time, a substantial difference in the kind of wrongful behavior covered (on the one hand by the state statute, on the other, by federal enactments) will ordinarily indicate a gap for a state statute to fill—unless Congress, through the comprehensiveness of its regulation, or through language revealing a conflicting policy, indicates to the contrary in a particular case. The primary question (we repeat) is one of legislative intent: Does applicable federal law indicate an intent to punish conduct such as the defendant's to the exclusion of the particular state statute at issue?

*Id.* at 164–66, 118 S.Ct. 1135 (citations omitted).

In this case, the Ohio statute was assimilated into Article 134 by the ACA. Section 2903.04 of the Ohio Revised Code provides as follows:

(A) No person shall cause the death of another or the unlawful termination of another's pregnancy as a proximate result of the offender's committing or attempting to commit a felony.

\* \* \*

(C) Whoever violates this section is guilty of involuntary manslaughter.

The Ohio legislature enacted the above revision of its involuntary-manslaughter statute with an effective date of September 6, 1996. Appellant assaulted his wife thereby terminating her pregnancy on September 12, 1996.

Before it was amended, § 2903.04(A) provided: "No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit a felony." The term "death of another" had been interpreted by Ohio courts as meaning "the death of another person," and "person" was defined as one "born alive." *State v. Dickinson,* 28 Ohio St.2d 65, 275 N.E.2d 599, 601 (1971). Senate Bill 239 amended § 2901.01 of the Ohio Revised Code to define "person" to include all of the following:

(i) An individual, corporation, business trust, estate, trust, partnership, and association; [and]

(ii) An unborn human who is viable.

(Emphasis added.)

In the same bill, § 2903.04 was amended to add the words, "or the unlawful termination of another's pregnancy."

The drafters' analysis of Senate Bill 239 reflects that the House made significant changes to the original Senate Bill, but the language including a viable fetus in the definition of "person" was retained, "so that as a matter of principle, a viable fetus is considered a person in the Criminal Code in the state of Ohio." The analysis explains the amendment of § 2903.04 as follows:

However, the amendments which were added by the House, override that language, so that it serves no practical purpose. The language of the bill that was passed by the Senate remains in the bill that was signed by the Governor, but is merely academic or symbolic. The substantive portions of this new law which will be used by Prosecutors in criminal proceedings were contained in the following House amendments.

The first House amendment added "causing the unlawful termination of another's pregnancy" to Ohio's homicide statute. This has the effect of making it a homicidal offense to cause the death of a fetus *at any stage of the pregnancy.*

(Emphasis added.)

The Ohio courts have interpreted the statute consistently with the drafters' analysis.

*See State v. Coleman,* 124 Ohio App.3d 78, 705 N.E.2d 419 (1997) (statute applicable even if fetus is not viable).

The fact that the Ohio legislature has classified the offense proscribed by § 2903.04 as involuntary manslaughter is not dispositive of the determination whether it can be assimilated. In order to apply the test set forth by the Supreme Court in *Lewis,* this Court must examine the plain language of the Ohio statute. That statute prohibits acts which "cause the death of another *or* the unlawful termination of another's pregnancy." (Emphasis added.) By drafting the "unlawful termination" language in the alternative, the legislature clearly distinguished the offense at issue from the traditional offense of manslaughter.

Congress did not specifically proscribe the killing of a fetus in either the UCMJ or the Federal Criminal Code. Articles 118 and 119 of the UCMJ proscribe murder and manslaughter, both of which are defined in terms of the unlawful killing of "a human being." Congress intended that Articles 118 and 119 be construed "with reference to the common law." *See United States v. Harrison,* 16 USCMA 484, 485, 37 CMR 104, 105 (1967). At common law, a newborn child was required to be "born alive" to be the subject of homicide. *United States v. Gibson,* 17 CMR 911, 923 (AFBR 1954); *see also United States v. Conway,* 33 CMR 903, 906 n. 1 (AFBR 1963) ("An unborn child is a part of its mother."). Under the Articles of War that preceded the UCMJ, the law provided that the subject of a homicide "must be a living being, (not an unborn child)." *See* W. Winthrop, *Military Law and Precedents* 672 (2d edition 1920 reprint); *see also* Davidson, *Fetal Crime and its Cognizability as a Criminal Offense Under Military Law,* The Army Lawyer at 23 (July 1998).

Similarly, the federal murder and manslaughter statutes, 18 USC §§ 1111 and 1112, define murder and manslaughter as the unlawful killing of "a human being." Although these statutes were intended to "enlarge the common law definition," they still require that an infant be "born alive" to be considered "a human being." The definition was broadened only to the extent that it eliminated the common-law requirement that the child "had existed independently from its mother prior to death." *See United States v. Spencer,* 839 F.2d 1341, 1343 (9th Cir.1988).

Applying the Supreme Court's *Lewis* analysis, we answer the first question in the negative: Congress did not proscribe the unlawful termination of another's pregnancy in either the UCMJ or the Federal Criminal Code. Under *Lewis,* that negative answer "will normally end the matter."

Applying this Court's analysis in *McGuinness,* we conclude that the offense to which appellant pleaded guilty is not "a residuum of elements of a specific offense," but instead is a separate offense proscribed by the Ohio Revised Code.

The Ohio statute does not conflict with congressional intent to preempt the field. To the contrary, legislation regarding termination of pregnancy is an area traditionally left to the states. *See Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973).

The Ohio statute does not enlarge or redefine an offense already proscribed by Congress. Section 2901.01, standing alone, would arguably be a redefinition and enlargement of federal law, because it broadens the definition of "a human being" to include a viable fetus. However, the legislative history reflects that § 2903.04, the provision assimilated in this case, effectively overrides § 2901.01. Section 2903.04 is broader than § 2901.01, because it applies to all fetuses, whereas § 2901.01 applies only to viable fetuses. Rather than redefine "a human being," § 2903.04 creates a new offense. The new offense is distinct from assault-type offenses, where the mother is the victim. It is distinct from homicide under the UCMJ or the Federal Criminal Code, which applies only to a child born alive. As such, § 2903.04 fills a gap in the criminal law and may properly be assimilated.

Since the offense is cognizable by a court-martial, there is no substantial basis to overturn appellant's guilty plea. *See United States v. Prater,* 32 MJ 433 (CMA 1991). However, to make clear that the offense of which appellant was convicted is not a homi-

cide, we will strike the reference to manslaughter from the specification.

### Decision

The specification of Charge II (renumbered) is amended by deleting the words, "commit involuntary manslaughter by" and changing the word "causing" to "cause."

The decision of the United States Air Force Court of Criminal Appeals with respect to the specification as modified, the remaining specifications and charges, and the sentence is affirmed.

SULLIVAN, Judge (concurring in the result):

I agree with the majority that appellant's conviction of violating Article 134, UCMJ, 10 USC § 934, by unlawfully terminating his wife's pregnancy may be affirmed in part. However, I cannot logically or legally distinguish this case from *Lewis v. United States,* 523 U.S. 155, 118 S.Ct. 1135, 140 L.Ed.2d 271 (1998), and *Williams v. United States,* 327 U.S. 711, 66 S.Ct. 778, 90 L.Ed. 962 (1946). Involuntary manslaughter is covered by Article 119(b), UCMJ, 10 USC § 119(b), and, therefore, we should not be assimilating Ohio's involuntary-manslaughter statute. *See generally United States v. McGuinness,* 35 MJ 149, 151–52 (CMA 1992). Nevertheless, I have chosen a different route to reach a result similar to the majority's.

Here, appellant pleaded guilty to the following offense under Article 134:

Specification 2: In that [appellant], Wright–Patterson Air Force Base, Ohio, a place under exclusive or federal concurrent jurisdiction, did, at or near Wright–Patterson Air Force Base, Ohio, on or about 12 September 1996, *commit involuntary manslaughter by* caus[e]*ing* the unlawful termination of the pregnancy of Karlene A. Robbins as a proximate result of the said [appellant's] committing a felony or misdemeanor offense, to wit: assault upon Karlene A. Robbins, *in violation of Section 2903.04 of the Ohio Revised Code assimi-*

*lated into Federal law by 18 United States Code, Section 13.*

(Emphasis added.)

In addition, he admitted in his guilty-plea inquiry that his conduct in terminating his wife's pregnancy by means of an assault on her person was a service disorder and service discredit. That inquiry shows:

MJ: Now, conduct prejudicial to good order and discipline is conduct which causes a reasonably direct and obvious injury to good order and discipline. Service discrediting conduct is conduct which tends to harm the reputation of the service or to lower it in public esteem. Do you agree that your conduct in unlawfully terminating the pregnancy of your wife while committing an aggravated assault upon her, intending to inflict grievous bodily harm upon her, that that is service discrediting conduct, or is conduct prejudicial to good order and discipline?

ACC: Yes, Your Honor.

MJ: Which one do you think it is? Or do you think it's both?

ACC: It's both, Your Honor.

MJ: Okay, and can you tell me why you think that's so?

(Accused conferred with counsel.)

ACC: Your Honor, the fact that I'm a member of the service, it reflects on the whole service, the Air Force, and the fact that the behavior—that explains that it is wrong.

MJ: Do you agree that members of the general public might think less of the United States military forces if they knew that a member of the military unlawfully terminated his wife's pregnancy by—while in the course of committing an assault upon her which resulted in grievous bodily harm to her?

ACC: Yes, Your Honor.

MJ: And do you agree that that would discredit the service, perhaps, in the public's eyes?

ACC: Yes, Your Honor.

Under this Court's decision in *United States v. Epps,* 25 MJ 319, 322–23 (1987), and *United States v. Felty,* 12 MJ 438 (1982), appellant's conviction for unlawfully termi-

nating his wife's pregnancy by means of a criminal assault might be sustained as a service disorder or discredit. This is appropriate without regard to its characterization as involuntary manslaughter under state law. *See* W. Winthrop, *Military Law and Precedents* 731 (2d edition 1920 reprint) (assault of wife or any other woman is service disorder or discredit). Accordingly, I would strike the above underlined language concerning involuntary manslaughter and Ohio law from the specification noted above and otherwise affirm the findings of guilty and sentence.