# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

**No. ACM 40084**

————————————

**UNITED STATES**
*Appellee*

**v.**

**Jonathon A. DOMINGUEZ-SANDOVAL**
Airman First Class (E-3), U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

Decided 31 March 2022

————————————

*Military Judge:* Wesley A. Braun (arraignment); Andrew R. Norton.

*Sentence:* Sentence adjudged 11 January 2021 by GCM convened at Joint Base McGuire-Dix-Lakehurst, New Jersey. Sentence entered by military judge on 30 March 2021: Bad-conduct discharge, confinement for 12 months, reduction to E-1, and a reprimand.

*For Appellant:* Major Jenna M. Arroyo, USAF; Major Kasey W. Hawkins, USAF.

*For Appellee:* Lieutenant Colonel Matthew J. Neil, USAF; Major John P. Patera, USAF; Major Brittany M. Speirs, USAF; Mary Ellen Payne, Esquire.

Before KEY, ANNEXSTAD, and MEGINLEY, *Appellate Military Judges*.

Judge MEGINLEY delivered the opinion of the court, in which Senior Judge KEY and Judge ANNEXSTAD joined.

————————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

————————————

MEGINLEY, Judge:

In accordance with his pleas and pursuant to a pretrial agreement, a general court-martial composed of a military judge sitting alone convicted Appellant of three specifications of cyber harassment, on divers occasions, in violation of Subtitle 2, Part 5, Chapter 33, Section 4.1(a)(2), New Jersey Code of Criminal Justice (N.J. Stat. § 2C:33–4.1), assimilated into federal law by the Assimilative Crimes Act (ACA), 18 U.S.C. § 13, in violation of Article 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 934.[1,2] Appellant was sentenced to a bad-conduct discharge, confinement for 12 months, reduction to the grade of E-1, and a reprimand. The convening authority approved Appellant's request for deferment and waiver of the automatic forfeitures for the benefit of his dependents, and approved the sentence in its entirety.

Appellant raises three assignments of error on appeal: (1) whether his cyber-harassment convictions, which were based on New Jersey state law and assimilated into federal law, were barred by the specifically enumerated offense of indecent language under Article 134, UCMJ; (2) in the alternative, whether Appellant's guilty pleas to the same convictions were improvident due to the military judge's use of the *Manual for Courts-Martial's* definition of "indecent;" and (3) whether the "convictions . . . were improvident" as Appellant's language was not indecent when considered in the context of a pornographic website.[3] We have carefully considered issue (3) and determine it has no merit and warrants no discussion or relief. *See United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987). We find no error that has materially prejudiced the substantial rights of Appellant, and affirm the findings and sentence.

## I. BACKGROUND

Appellant joined the Air Force in September 2017 and, at the time of his offenses, was stationed at Joint Base McGuire-Dix-Lakehurst (JBMDL), New Jersey. Appellant's offenses originated in his dormitory room, located on JBMDL, an installation under exclusive federal jurisdiction. At the time of his

---

[1] Unless otherwise stated, all references in this opinion to the punitive articles of the UCMJ are to those contained in the *Manual for Courts-Martial, United States* (2016 ed.). Because the charges and specifications were referred to trial after 1 January 2019, the *Manual for Courts-Martial, United States* (2019 ed.) applies. *See* Exec. Order 13,825, §§ 3, 5, 83 Fed. Reg. 9889, 9889–90 (8 Mar. 2018).

[2] The pretrial agreement capped the maximum amount of confinement to 18 months.

[3] Appellant raises this third issue pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

court-martial, Appellant was 26 years old. As part of his pretrial agreement, Appellant agreed to a stipulation of fact. The information provided in the stipulation of fact and in Appellant's providence inquiry form the basis for the following factual background. In an effort to not further exploit the victims in this case, we have declined to specifically name the social media platforms and websites Appellant used to perpetrate his crimes.

**A. Victim AS**

Between 1 August 2018 and 30 November 2018, Appellant became angry with AS, an acquaintance, who had previously made a report of sexual assault against Appellant to the Air Force Office of Special Investigations (AFOSI).[4] In response to her report, Appellant created a fake profile on a pornographic website which permits users to post and stream content. In creating this profile, Appellant used AS's name, hometown, and pictures obtained from her actual social media accounts. From the time of its creation, Appellant maintained exclusive control over the false profile which contained graphic, indecent, lewd, and disturbing descriptions of AS's purported sexual preferences, history, and desires.

Further, in the profile, Appellant included AS's actual username for two of her social media accounts so that viewers could send her lewd and indecent photos and messages. Appellant provided this information knowing it would cause AS extreme emotional harm. Appellant acknowledged he engaged with other users on the pornographic website through the fake profile he had created, to include responding to multiple direct messages from users who believed they were engaging with AS. Those responses were as lewd and indecent as language he used to create AS's fake profile. During his providence inquiry, Appellant stated, "I knew if people saw what I posted, it would be upsetting, embarrassing and degrading for [AS]. I wanted to upset her at the time I did this." Appellant agreed his language was "lewd and offensive," and "extremely vulgar, disgusting, [and] degrading."

---

[4] Appellant was initially charged with sexual assault upon AS, in violation of Article 120, UCMJ, 10 U.S.C. § 920, however, that charge and its specification were withdrawn and dismissed with prejudice after arraignment in accordance with the pretrial agreement. Appellant was also charged with two specifications of invasion of privacy in violation of Subtitle 2, Part 1, Chapter 14, Section 9(c), New Jersey Code of Criminal Justice (N.J. Stat. § 2C:14-9(c)), assimilated into federal law by 18 U.S.C. § 13. Arguing that the specifications were preempted by Article 117a, UCMJ, 10 U.S.C. § 917a, Defense moved to dismiss the specifications, which the Government did not oppose. The military judge granted the motion.

AS did not consent to or in any way communicate a desire to Appellant that she wanted an account on the pornographic website, much less one which solicited viewers to send nude pictures to her other social media accounts.[5] In describing the effect Appellant's actions had on her, AS testified in presentencing that one morning when she woke up she had received "over 100" videos, pictures, and messages on one social media platform. She also "had over 50 [direct messages] . . . and friend requests" on another social media platform. Some of the messages included videos "of males jerking off and [ejaculating] on a mirror, [or] [ejaculating] on themselves."

AS clarified that "jerking off" meant that these men "were masturbating to their phone," and "sending it directly to [her]." AS estimated there were over 100 of these messages. AS stated, "I tried to delete them. [The social media account] was glitching. It wouldn't let me delete them. I had to keep opening them and clicking fast through them to get them off of my phone and they just didn't stop." AS then stated, "[The men] would get mad that I didn't respond to them. They would tell me, you made this profile and you don't want to contact and talk to any of us, [and you] don't want to send [us] pictures." Finally, AS discussed their desires: "They asked for me to send pictures of my boobs. They asked me to send pictures of me touching myself . . . [and] they asked [me] . . . to do stuff on the phone, basically[,] like phone sex." AS also stated that she was concerned for her safety: "I was afraid to go to the mall, I was afraid to do a lot of different things. I just did what I needed to get done at that time and then I would go back to my dorm and isolate myself in my dorm room."

**B. Victim AG**

In October or November 2018, Appellant was also upset with AG. Following the end of a long off-and-on relationship with Appellant, AG began to date another man. Like he did to AS, Appellant created another fake profile on the same pornographic website using AG's name and personal details, including her hometown—knowing people from her hometown would reach out to her. The profile also contained graphic, lewd, and indecent descriptions of AG's purported sexual desires.

In addition to the false profiles described above, Appellant also had his own personal account on the pornographic website as well as on a second pornographic website which also permitted users to upload and view pornographic content during the charged timeframe. On the first of these personal accounts, Appellant wrote a short comment that stated, in so many words, that when

---

[5] Due to the graphic nature of Appellant's posts, along with the identifying information he disclosed about his victims, this court ordered the stipulation of fact and its attachments sealed and has chosen not to disclose the full extent of Appellant's communications and postings.

women wronged him, he would expose them. While in his dorm room at JBMDL, Appellant also uploaded a video of AG performing oral sex on him to this account and titled the video with lewd and indecent language. Appellant wrote AG's full name in the title. Appellant also uploaded screenshots of the video to his photo album, which he similarly titled in a lewd and indecent manner. Also during the same charged timeframe, Appellant used his profile and uploaded the same video to his account on the second website and titled it using lewd and indecent language.

Appellant acknowledged he created the fake profile pages and uploaded the videos in order to cause AG extreme emotional distress and harm. During his providence inquiry, Appellant specifically stated,

> I also posted a video on the website of her performing oral sex on me. I knew what I did was wrong. I intended to cause her emotional harm when posting these things. [AG] is my ex-girlfriend. I posted her name, her age and that she was from [ ], knowing that strangers could contact her. I knew that the [the pornographic website] profiles were open to the public and that anyone could see them and what I was posting on them. I knew that if people saw what I had posted, it would be upsetting, embarrassing and degrading for her. I wanted to upset her at the time that I posted everything.

AG did not consent to Appellant posting her information on either of the websites, nor did she communicate any desire that she wanted him to do so. In presentencing, AG testified that Appellant's actions "caused a great anxiety in terms of my career," and if "anyone found out or saw the video, I could have lost my internship." She also had anxiety because "I was very afraid that someone could find me and do physical harm to me."

## C. Victim TC

Appellant met TC via an online dating platform while he was on temporary duty (TDY) at Scott Air Force Base, Illinois. At some point during this TDY, Appellant filmed TC performing oral sex on him. In October or November 2018, Appellant became upset with TC because she was ignoring him on social media and told him that she had a boyfriend. Appellant then uploaded the video of her performing oral sex on him to his personal accounts on the two pornographic websites and gave the video lewd and indecent titles. As with AG, Appellant took screenshots of the video which he uploaded and posted those to his photo album. Appellant admitted he used lewd and indecent language in the title for the video. Appellant committed these acts without the consent of TC. During his providence inquiry, Appellant stated,

I posted lewd and indecent language about [TC] on [the two websites] . . . I described her engaging in sexual acts. What I wrote was very demeaning. None of it was true. All of it was inappropriate.

I also posted a video on the websites of her performing oral sex on me. I knew what I did was wrong. I intended to cause her emotional harm when I posted these things. I met [TC] on [the dating platform] while TDY to Scott Air Force Base. I knew that [the pornographic website] profiles were open to the public and that anyone could see them and what I posted. I knew that people – pardon, I knew if people saw what I posted [it] would be upsetting, embarrassing and degrading for her. I wanted to upset her when I posted what I did.

## D. AFOSI Investigation

During their investigation, AFOSI agents traced the uploaded videos to email addresses associated with Appellant and to Internet protocol addresses associated with his cell phone. Additionally, upon a proper search and seizure, forensic analysis revealed that the two videos of AG and TG performing oral sex, described above, were also present on Appellant's digital devices. The analysis also showed four emails to Appellant—two from Appellant's personal account on the first pornographic website stating that the video of AG was successfully uploaded, dated 8 October 2018 and 15 November 2018, and two from the second website—one referencing the video of AG and one referencing the video of TC, both dated 22 October 2018.

## II. DISCUSSION

## A. Assimilation of New Jersey's Cyber-Harassment Law

### 1. Additional Background

Appellant argues the Government "could have, and should have" charged him with "the specifically enumerated offense of indecent language under Article 134, UCMJ," instead of charging him with the New Jersey cyber-harassment offense, because the military judge focused on the indecent language used by Appellant during his providence inquiry. Under the assimilated New Jersey crime of cyber-harassment, Appellant faced a maximum confinement of 54 months, or 18 months for each specification. However, had Appellant been charged with indecent language under Article 134, UCMJ, he would have faced a maximum confinement of 18 months, or 6 months for each specification. *See Manual for Courts-Martial, United States* (2016 ed.) (*MCM*), pt. IV, ¶ 89.e.(2).

With the exception of the names of the three victims, and the omission of a reference to the name of the second website in AS's specification, the specifications of the offenses to which Appellant pleaded guilty were identical and read as follows:

> In that [Appellant], on divers occasions, did, at Joint Base McGuire-Dix-Lakehurst, a place under exclusive federal jurisdiction, between on or about 1 August 2018 and on or about 30 November 2018, knowingly post lewd and indecent language about [victim] on [the two pornographic websites], with the intent to cause her emotional harm, in violation of Subtitle 2, Part 5, Chapter 33, Section 4.1(a)(2) of the New Jersey Code of Criminal Justice, an offense not capital, assimilated into [f]ederal law by 18 U.S. Code Section 13.

New Jersey criminalized "cyber-harassment" in 2014.[6] In regards to Appellant's case, there are two elements which must be satisfied for a finding of guilty: (1) Appellant made a communication in an online capacity via any electronic device or through a social networking site with the purpose of harassing another, and (2) Appellant knowingly sent, posted, commented, requested, suggested, or proposed any lewd, indecent, or obscene material to or about a person with the intent to emotionally harm a reasonable person or place a reasonable person in fear of physical or emotional harm. *See* N.J. Stat. § 2C:33-4.1. The statute does not define the terms lewd, indecent, or obscene material.

The military judge advised Appellant that the elements of his offenses were as follows:

> (1) That between on or about 1 August 2018 and on or about 30 November 2018, on divers occasions, [Appellant] did, knowingly, post language about [each victim] on [the first pornographic website] and [the second website] (except for AS);
>
> (2) That the language was lewd and indecent;
>
> (3) That [Appellant] did so with the intent to cause [each victim] emotional harm;
>
> (4) That [Appellant] did so at Joint Base McGuire-Dix-Lakehurst, New Jersey;
>
> (5) That Joint Base McGuire-Dix-Lakehurst, New Jersey, is a place under exclusive federal jurisdiction;

---

[6] N.J. Stat Ann. § 2C:33-4.1 (West 2022) (L. 2013, c. 272, § 1, eff. Jan. 17, 2014; amended by 2021, c. 327, § 2, eff. 21 Dec. 2021; 2021, c. 338, § 1, eff. 10 Jan. 2022).

(6) That the offense was a violation of Subtitle 2, Part 5, Chapter 33, section 4.1(a)(2) of the New Jersey Code of Criminal Justice;

(7) That the offense under the New Jersey Code of Criminal Justice is assimilated into [f]ederal law by 18 United States Code, Section 13; and

(8) That the offense is not a capital offense.

The military judge then advised Appellant that

"[i]ndecent" language is that which is grossly offensive to modesty, decency or propriety, or shocks the moral sense because of its vulgar, filthy or disgusting nature, or its tendency to incite lustful thought. Language is indecent if it tends reasonably to corrupt morals or incite libidinous thoughts. The language must violate community standards.

The military judge's explanation of "indecent" language is the same as found in the Manual. *See MCM*, pt. IV, ¶ 89(c). With respect to the New Jersey statute for cyber-harassment, the military judge advised Appellant,

a person commits the crime of cyber harassment if while making a communication in an online capacity, via any electronic device or through a social networking site, and with the purpose to harass another, the person knowingly sends, posts, comments, requests, suggests or proposes any lewd, indecent or obscene material to or about a person with the intent to emotionally harm a reasonable person or place a reasonable person in fear of physical or emotional harm to his person.

**2. Law**

Congress enacted the Federal Assimilative Crimes Act to adopt

state criminal laws for areas of exclusive or concurrent federal jurisdiction, provided federal criminal law, including the UCMJ, has not defined an applicable offense for the misconduct committed. The Act applies to state laws validly existing at the time of the offense without regard to when these laws were enacted, whether before or after passage of the Act, and whether before or after the acquisition of the land where the offense was committed.

*MCM*, pt. IV, ¶ 60.c.(4)(c)(ii). "If conduct by an accused does not fall under any of the enumerated Article 134 offenses (paragraphs 61 through 113 of this Part), a specification not listed in this Manual may be used to allege the offense." *MCM*, pt. IV, ¶ 60.c.(6)(a).

"[T]he purpose of the ACA is not to enforce state law, but to fill gaps in the federal criminal law." *United States v. Robbins*, 48 M.J. 745, 749 (A.F. Ct. Crim. App. 1998) (citation omitted), *aff'd*, 52 M.J. 159 (C.A.A.F. 1999). "[A] substantial difference in the kind of wrongful behavior covered (on the one hand by the state statute, on the other, by federal enactments) will ordinarily indicate a gap for a state statute to fill . . . ." *Robbins*, 52 M.J. at 162 (quoting *Lewis v. United States*, 523 U.S. 155, 164 (1998)). In focusing on the "gap-filling purpose" of the ACA, the United States Supreme Court, in *Lewis*, stated,

> [A] court must first ask the question that the ACA's language requires: Is the [Appellant]'s "act or omission . . . made punishable by *any* enactment of Congress." If the answer to this question is "no," that will normally end the matter. The ACA presumably would assimilate the statute. If the answer to the question is "yes," however, the court must ask the further question whether the federal statutes that apply to the "act or omission" preclude application of the state law in question, say, because its application would interfere with the achievement of a federal policy, because the state law would effectively rewrite an offense definition that Congress carefully considered, or because federal statutes reveal an intent to occupy so much of a field as would exclude use of the particular state statute at issue.

*Id.* at 161–62.

"Whether an offense is preempted depends on statutory interpretation, which is a question of law we review de novo." *United States v. Wheeler*, 77 M.J. 289, 291 (C.A.A.F. 2018) (citation omitted). Appellant's guilty plea neither forfeits nor waives the issue of preemption. *See Robbins*, 52 M.J. at 160. The basis for the preemption doctrine is the principle that if Congress "has occupied the field for a given type of misconduct," such as with offenses covered by Articles 80 through 132 in the Manual, then a specification alleging that conduct cannot be created and punished under Article 134, UCMJ, simply to delete a vital element. *See id.* at 160–61. A claim of preemption, therefore, presents a question of subject-matter jurisdiction of the trial court, and cannot be waived by either a plea or failure to object. *See United States v. Jones*, 66 M.J. 704, 706 (A.F. Ct. Crim. App. 2008). Notwithstanding Appellant's pretrial agreement to "waive[ ] all waivable motions," Rule for Courts-Martial 705(c)(1)(B) states "[a] term or condition in a pretrial agreement shall not be enforced if it deprives the accused . . . the right to challenge the jurisdiction of the court-martial . . . ." *Manual for Courts-Martial, United States* (2019 ed.) (2019 *MCM*). "If [an] offense [is] improperly assimilated, it [is] not cognizable by a court-martial." *Robbins*, 52 M.J. at 160.

The *Manual for Courts-Martial* limits the assimilation of state criminal statutes stating,

> The preemption doctrine prohibits application of Article 134 to conduct covered by Articles 80 through 132. For example, larceny is covered in Article 121, and if an element of that offense is lacking—for example, intent— there can be no larceny or larceny-type offense, either under Article 121 or, because of preemption, under Article 134. Article 134 cannot be used to create a new kind of larceny offense, one without the required intent, where Congress has already set the minimum requirements for such an offense in Article 121.

*MCM*, pt. IV, ¶ 60.c.(5)(a). Our superior court, the United States Court of Appeals for the Armed Forces, has held that if the two following questions are answered affirmatively, then assimilation is precluded by the preemption doctrine:

> The primary question is whether Congress intended to limit prosecution for wrongful conduct within a particular area or field to offenses defined in specific articles of the Code; the secondary question is whether the offense charged is composed of a residuum of elements of a specific offense and asserted to be a violation of either Articles 133 or 134, which, because of their sweep, are commonly described as the general articles.

*Robbins*, 52 M.J. at 161 (citing *United States v. McGinnis*, 35 M.J. 149, 151–52 (C.M.A. 1992)). Put another way, preemption is the "legal concept that where Congress has occupied the field of a given type of misconduct by addressing it in one of the specific punitive articles of the code, another offense may not be created and punished under Article 134, UCMJ, by simply deleting a vital element." *United States v. Kick*, 7 M.J. 82, 85 (C.M.A. 1979) (citations omitted).

Preemption prevents the Government from turning to a "hypothetical federal noncapital crime that lessened its evidentiary burden at trial by circumventing the mens rea element or removing a specific vital element from an enumerated UCMJ offense." *Wheeler*, 77 M.J. at 293. In other words, the preemption doctrine "is designed to prevent the [G]overnment from eliminating elements from congressionally established offenses under the UCMJ, in order to ease their evidentiary burden at trial." *Id.* (citations omitted).

The required elements for an offense under the "crimes and offenses not capital" clause of Article 134, UCMJ, are: (1) the accused did or failed to do

certain acts that satisfy each element of the state statute (including assimilated state law); and (2) that the charged offense was not capital. *See MCM*, pt. IV, ¶ 60.b.(2).

With respect to the elements of a crime, in interpreting *Lewis*, the United States Army Court of Criminal Appeals reasoned that "[w]hen analyzing whether a state law is preempted and not subject to incorporation or whether that state law can be applied on federal enclaves via assimilation, the Supreme Court expressly rejected a strict elements or 'precise acts' test." *United States v. Rodriguez*, ARMY 20130577, 2016 CCA LEXIS 145, at *6 (A. Ct. Crim. App. 7 Mar. 2016) (unpub. op.) (citing *Lewis*, 523 U.S. at 165). "Instead, the high court reasoned, 'it seems fairly obvious that the [Federal Assimilative Crimes Act] will not apply where both state and federal statutes seek to punish approximately the same wrongful behavior.'" *Id.*

"The President first included indecent language as an enumerated offense under Article 134, UCMJ, in 1984. *MCM* pt. IV, para. 89 (1984 ed.)." *United States v. Avery*, 79 M.J. 363, 367 (C.A.A.F. 2020). The elements of the crime of indecent language under Article 134, UCMJ, are: (1) the accused orally or in writing communicated to another person certain language; (2) such language was indecent; and (3) under the circumstances, the conduct of the accused was to the prejudice of good order and discipline in the armed forces or was of a nature to bring discredit upon the armed forces. *See MCM*, pt. IV, ¶ 89.b. Our superior court has stated that what constitutes indecent language is language "which is grossly offensive to modesty, decency or propriety, or shocks the moral sense, because of its vulgar, filthy, or its disgusting nature, or its tendency to arouse lustful thought. The language used must violate community standards of decency and substantially exceed customary limits of candor." *United States v. French*, 31 M.J. 57, 59 (C.M.A. 1990) (citations omitted). Whether language is indecent depends in part on context and "we must examine the entire record of trial to determine the precise circumstances under which the charged language was communicated." *United States v. Green*, 68 M.J. 266, 270 (C.A.A.F. 2010) (citations omitted). "Words do not have to be indecent per se to constitute an offense. Depending on the context in which they are used, even words which are themselves innocuous can be indecent." *United States v. Stitely*, No. ACM 37039, 2008 CCA LEXIS 170, at *11 (A.F. Ct. Crim. App. 23 Apr. 2008) (unpub. op.) (citing *United States v. Coleman*, 48 M.J. 420, 423 (C.A.A.F. 1998)). The "test is whether the particular language is *calculated* to corrupt morals or excite libidinous thoughts." *United States v. Brinson,* 49 M.J. 360, 364 (C.A.A.F. 1998) (citations omitted).

### 3. Analysis

The crime of communicating indecent language under Article 134, UCMJ, has remained generic and virtually unchanged for the past 38 years. When it

was enacted in 1984, there were no online dating platforms or websites that allowed users to upload their own pornographic content. There were no smart phones or social media applications. *There was no Internet as we know it.* The focus of the indecent language offense is whether an accused has written or spoken particular language that is calculated to corrupt morals or excite libidinous thoughts and which has an effect on good order and discipline or the reputation of the armed forces. The scope of what could be indecent language is rather broad and is dependent on the particular circumstance.

Conversely, New Jersey's cyber-harassment law goes beyond mere communication of written or oral indecent language. It focuses on online or cyber conduct where there is specific intent to inflict emotional harm or induce fear of physical or emotional harm. *State v. Burkert*, 174 A.3d 987, 996 (N.J. 2017) (observing the law "limits the criminalization of speech mostly to those communications that threaten to cause physical or emotional harm or damage."). The law is an example of a state's attempt at addressing changing times and a reflection of a modern and highly digital world. It looks at a perpetrator's intent to harm another by cyber or digital means, and the potentially endless tangible and intangible effects that behavior may have on victims due to ubiquity and permanence of things posted on Internet-based social media.

The UCMJ offense of communicating indecent language and the New Jersey offense of cyber-harassment do not seek to punish the same, or even approximately the same, wrongful behavior. Even the most superficial review of the two offenses reveals why Appellant's argument must fail—only cyber-harassment requires a victim. While Appellant may believe he committed the victimless crime of indecent language, this court does not. Appellant's intent to cause harm is an aspect of New Jersey's law that goes beyond the scope of indecent language. Appellant went beyond merely communicating indecent language to another. He used multiple digital platforms, including two websites dedicated, in part, to the viewing and uploading of pornography, to disclose his victims' personal and contact information, and with AG and TC, he attach videos of them engaged in sexual acts. With regard to AS, Appellant's acts were done as reprisal for her reporting his alleged criminal conduct to law enforcement. Appellant intentionally crafted an environment where the privacy of his victims could be regularly invaded. Even if Appellant or some other person could remove the videos from the world-wide web, the damage had already been done. As soon as these fake profiles were created and videos were uploaded, the identifying information and videos could be accessed by anyone. Through his use of indecent and lewd language, along with personal information about the victims, Appellant's behavior potentially placed these women in a never-ending and ever-growing state of exploitation.

Applying the *Lewis* test, Appellant's acts could have been charged under Article 134, UCMJ, *Indecent language*. However, we find the indecent language offense under Article 134 does not reveal an intent to eliminate an element as to exclude use of the New Jersey law. The New Jersey law does not interfere with the achievement of a federal policy, and it does not effectively rewrite an offense definition that Congress has already occupied. Thus, the Article 134 offense does not preclude application of the New Jersey law through assimilation.

In this case, the Government "incorporated a specific [state] statute aimed with precision at a particular type of intentional conduct with its own evidentiary burden." *Wheeler*, 77 M.J. at 293 (citations omitted). Preemption doctrine would prevent the Government from assimilating New Jersey state law to "circumvent an element of an enumerated offense" or to "lessen[ ] its evidentiary burden at trial." *See id.* However, that did not happen in this case. Quite the opposite: the Government was required to meet a specific, heightened mens rea with respect to Appellant's intent to cause emotional harm. This heightened mens rea further undermines the claim that the New Jersey statue was preempted by Article 134's enumerated indecent language offense. If anything, had this case been litigated, assimilating the New Jersey crime of cyber-harassment would have made obtaining a conviction more difficult given that there were more elements the Government would have to prove, the specific mens rea, and the foundational and evidentiary requirements needed to address the social media aspects of the crimes. Since the offense of cyber-harassment is cognizable by a court-martial, we find the Government was not preempted from charging New Jersey's crime on cyber-harassment, and there is no substantial basis to overturn Appellant's guilty plea on this ground.

## B. Providence of Appellant's Guilty Pleas

### 1. Additional Background

Appellant argues that his guilty pleas were improvident because the military judge erred when he used the definition of indecent conduct from the Manual, instead of the definitions or explanations from New Jersey state law. Appellant also claims the military judge failed to define "lewd" during the providence inquiry, despite all three specifications using the words "lewd and indecent."

### 2. Law

We review a military judge's decision to accept the accused's guilty plea for an abuse of discretion. *United States v. Inabinette*, 66 M.J. 320, 322 (C.A.A.F. 2008). "A military judge abuses this discretion if he fails to obtain from the accused an adequate factual basis to support the plea—an area in which we afford significant deference." *Id.* "There exists strong arguments in favor of

giving broad discretion to military judges in accepting pleas, not least because facts are by definition undeveloped in such cases." *Id.* "[I]n reviewing a military judge's acceptance of a plea for an abuse of discretion appellate courts apply a substantial basis test: Does the record as a whole show 'a substantial basis in law and fact for questioning the guilty plea.'" *Id.* (quoting *United States v. Prater*, 32 M.J. 433, 436 (C.M.A. 1991) (internal quotation marks omitted)).

"An essential aspect of informing Appellant of the nature of the offense is a correct definition of legal concepts. The judge's failure to do so may render the plea improvident." *United States v. Negron*, 60 M.J. 136, 141 (C.A.A.F. 2004) (first citing *United States v. O'Connor*, 58 M.J. 450, 453 (C.A.A.F. 2003); and then citing *United States v. Pretlow*, 13 M.J. 85, 88–89 (C.M.A. 1982)). However, "an error in advising the accused does not always render a guilty plea improvident. Where the record contains factual circumstances that objectively support the guilty plea to a more narrowly construed statute or legal principle, the guilty plea may be accepted." *Id.* (internal quotation marks and citations omitted).

### 3. Analysis

Assessing the record as a whole, we find there is no substantial basis in law or fact to question Appellant's guilty plea. In particular, we find the military judge did not abuse his discretion in accepting Appellant's pleas to cyber-harassment. Appellant is correct that the military judge did not define the word lewd, nor did he define the word indecent under New Jersey law. Yet, in *State v. Tate*, the New Jersey Supreme Court acknowledged, "In the absence of a legislative definition, we generally ascribe to the words used 'their ordinary meaning and significance.'" 106 A.3d 1195, 1204 (N.J. 2015) (cleaned up) (citations omitted). "The words profane and indecent, and even obscene, are not susceptible to neat and fixed definitions." *Id.* (footnote omitted). That court later stated,

> Indecent is defined variously as "altogether unbecoming"; "contrary to what the nature of things or what circumstances would dictate as right or expected or appropriate"; "not conforming to generally accepted standards of morality"; "tending toward or being in fact something generally viewed as morally indelicate or improper or offensive"; and "being or tending to be obscene."

*Id.* (citations omitted). Section 2C:14-4, of the New Jersey Code of Criminal Justice, *Lewdness*, defines "lewd acts" as "exposing of the genitals for the purpose of arousing or gratifying the sexual desire of the actor or of any other person." N.J. Stat. § 2C:14-4 (1992).[7]

There is no reason to believe that New Jersey's cyber-harassment law indicates some notion or idea that is different than what constitutes indecent or lewd behavior under applicable military law. Even though the military judge did not explain the meaning of lewd and used the Manual's definition of indecent, Appellant's own words, coupled with the stipulation of fact, demonstrate that he understood these words within the legal framework. When the military judge asked Appellant if he understood the definition of indecent, he said "yes" without any questions. Regarding AS, when Appellant was asked why he believed that messages that he sent to other users via the first pornographic website were "lewd and indecent language," he responded, "I used the same disgusting language that was found on the user profile with other users." He then provided examples of the language he used, which this court has intentionally not included. The military judge again asked Appellant why he believed the language he posted about AS was "lewd and indecent language," to which he stated, "It was extremely vulgar, disgusting, degrading." When the military judge asked the same question regarding AG, Appellant acknowledged the language he used was lewd and indecent because what he "posted was very sexual in nature" and "degrading and disgusting." Appellant also opined that the language posted would "shock the moral sense because of its vulgar filthy, or disgusting nature." Finally, Appellant confirmed the titles of the video he uploaded to the two websites were the lewd comments for the offense regarding TC.

Therefore, we disagree with Appellant that the Manual's definition of indecent is not an adequate substitute for New Jersey's legal definitions of indecent. Neither Appellant nor his counsel notified the military judge that Appellant did not understand what lewd or indecent meant, nor did they suggest an alternative definition. Finally, the record contains ample facts that objectively support the guilty plea. The military judge's inquiry was not limited solely to

---

[7] The Government notes: (1) there is one New Jersey appellate court decision, *State v. Carroll*, 196 A.3d 106, 115 (N.J. Super. Ct. App. Div. 2018), where that court concluded "the term 'indecent' is associated with nudity or sexuality;" (2) that the opinion "did not elaborate further" on the meaning; and (3) that there are no published decisions from New Jersey appellate courts that define "lewd" within the context of the cyber-harassment statute. "Lewdness" is defined in N.J. Stat. § 2C:14-4, but is focused on the exposure of one's genitals "for the purpose of arousing or gratifying the sexual desire of the actor or of any other person."

Appellant's communication of indecent language. The military judge questioned Appellant about his behavior, and how his actions violated the New Jersey law. Appellant provided a sworn stipulation of fact, which contained screenshots of Appellant's personal accounts on the two pornographic websites along with postings related to his victims. The military judge reviewed the stipulation with Appellant, secured Appellant's agreement that it was all true, and confirmed that Appellant wished to admit it was true. In addition, after the military judge explained the elements of each offense to Appellant, the military judge had Appellant explain in his own words why he was guilty of each offense. The military judge asked follow-on questions to ensure that Appellant agreed each element of each offense had been established, and that his actions were intentional and unlawful under the circumstances. Following the military judge's questions, counsel for both parties agreed no further inquiry was required. Having reviewed Appellant's providence inquiry, along with his stipulation of fact, we are satisfied Appellant's pleas are provident.

In summary, the military judge's inquiry regarding the providence of Appellant's guilty pleas was thorough. At no point did Appellant indicate he was confused or mistaken about what he was pleading to, or that his pleas were less than fully informed, voluntary, or factually accurate. Finding no substantial basis in law or fact in the record of the court-martial proceedings to question Appellant's guilty pleas, we find the military judge did not abuse his discretion by finding Appellant guilty of the cyber-harassment offenses under New Jersey law.

## III. CONCLUSION

The findings and sentence as entered are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(d), UCMJ, 10 U.S.C. §§ 859(a), 866(d) (2019 *MCM*). Accordingly, the findings and sentence are **AFFIRMED**.

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court

16